THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL ROY, Defendant-Appellant.

Fourth District   No. 4—89—0744

Opinion filed June 27, 1990.—Rehearing denied September 18, 1990.

James L. Ayers, of Monticello, for appellant.

Roger Simpson, State's Attorney, of Monticello (Leonard R. Rumery, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Defendant Michael Roy was charged by information with four counts of aggravated criminal sexual assault and two counts of criminal sexual assault. Each count alleged that in November 1988, defendant placed his finger in the anus of B.R., his four-year-old son. The State dismissed two counts of aggravated criminal sexual assault, and a bench trial was held on the remaining counts on June 16, 1989, and June 21, 1989. The court took the verdict and objections of defendant under advisement, and on July 7, 1989, announced its verdict of guilty on all remaining counts. Defendant was sentenced on one count of criminal sexual assault and one count of aggravated criminal sexual abuse to 36 months' probation. The conditions of the probation included psychiatric testing and treatment, counseling through an offender's program, payment for any counseling services engaged in by B.R. for the next five years, and six months' imprisonment in the Piatt County jail subject to work release. Defendant's motion to stay confinement pending appeal was granted.

Defendant appeals alleging (1) the trial court erred in admitting the testimony of Dr. Lanker and Dr. Beutow relaying B.R.'s out-of-court statements; (2) the trial court erred in admitting Dr. Beutow's testimony regarding post-traumatic stress syndrome; (3) the trial court erred in admitting the testimony of Carolyn Roy regarding B.R.'s out-of-court statements; (4) the trial court erred in admitting testimony of Pamela Gremmels regarding out-of-court statements and actions of B.R. and in admitting the publication *Red Flag, Green Flag People* (J. Williams, *Red Flag, Green Flag People* (rev. ed. 1983)); and (5) he was not proved guilty beyond a reasonable doubt. We affirm.

Carolyn Roy testified she lives in Monticello, Illinois, with her fiance, Brian Robbins, his minor child, and her two children, four-year-

old B.R. and three-year-old H.R. Carolyn and defendant were married in September 1982, and defendant is the father of both B.R. and H.R. Pursuant to their divorce in December 1987, Carolyn has custody of the children. Carolyn testified defendant resides with his mother, Christina Roy, at her residence in Monticello and has visitation with the children every other weekend and on holidays and special occasions.

In August 1988, Carolyn observed changes in B.R.'s behavior. B.R. no longer enjoyed his bath time, was having trouble sleeping, and was scared of the dark. B.R. did not complain of any physical pains, though he was extremely aggressive and angry. Carolyn testified it was in September or October 1988, B.R. switched from a private sitter to day care.

On Thanksgiving Day of 1988, Carolyn took B.R. and H.R. over to defendant's home around 6 p.m. Carolyn, B.R., and H.R. had earlier attended a Thanksgiving celebration with Carolyn's family. Carolyn made arrangements with defendant to pick the children up on the next day, Friday the 25th, after she got off work. When Carolyn arrived the next day at about 6 p.m., B.R. immediately said "Mommy, my butt hurts." When making this statement, B.R. did not make eye contact with Carolyn and was looking downward. Defendant, his mother, and H.R. were in the room at this time though defendant immediately left. B.R. began to cry, and Carolyn asked Christina what was wrong. Christina replied B.R. had awakened in the middle of the night screaming in pain. Christina said B.R. had had a little bit of diarrhea and she had put medicine on his bottom. Carolyn took B.R. and H.R. home.

When they arrived home, Carolyn, B.R., and H.R. watched TV and read a book with Brian and his son. Carolyn testified B.R. was upset and she could tell something was really bothering him. After the other two children were in bed and Brian was in another room, Carolyn asked B.R. what was wrong. B.R. was very uneasy about talking with her and continually complained his butt was hurting and he could not sit up anymore. B.R. asked Carolyn to put medicine on his butt like his dad and grandma do. Carolyn responded she could not put medicine on his butt until she knew what had happened to make it hurt because there are different kinds of medicine. At this point, B.R. stood up and stated "My daddy takes two fingers like this, and pokes them up my butt." Carolyn testified she hugged B.R. and told him she was sorry. She put B.R. to bed. This conversation between Carolyn and B.R. occurred sometime between 8 and 9 p.m.

The next morning Carolyn called Carle Clinic and spoke to Dr.

Lanker. Carolyn told Dr. Lanker she had reason to believe her son had been abused. Carolyn took B.R. to see Dr. Lanker and was present when B.R. was examined. Carolyn testified she had not told Dr. Lanker anything regarding B.R. being constipated as Christina had earlier informed her B.R. had had diarrhea.

Carolyn testified she had a conversation with defendant and his mother in August 1988, wherein she requested the children sleep by themselves during visitation. Defendant told her he had no problem with that and did not ever deny the children were sleeping with him or his mother.

William Lanker testified he is a physician with Carle Clinic. On Saturday, November 26, 1988, Dr. Lanker examined B.R. though he is not B.R.'s regular physician. The purpose of the examination concerned B.R.'s complaints of rectal pain. Carolyn Roy was present in the examining room. She told Dr. Lanker she had noticed B.R. would complain of this pain when he returned from a weekend with his father and of B.R.'s statement his father put two fingers up his butt. Carolyn also told Dr. Lanker B.R. had made inappropriate acts toward her sister's boyfriend at their family's Thanksgiving gathering. Her sister's boyfriend had been lying on a couch taking a nap when B.R. crawled between the boyfriend's legs and blew on his crotch. When told to stop, B.R. responded his father does it. Prior to the actual physical exam, Dr. Lanker tried to elicit from B.R. what caused his rectal pain and B.R. was reluctant to tell him.

Dr. Lanker observed it was painful for B.R. to sit. Dr. Lanker noticed this when B.R. entered the room and later when B.R. was asked to climb up on the examination table. When Dr. Lanker parted the cheeks of B.R.'s bottom to look at his anus, B.R. complained of tenderness and was reluctant for Dr. Lanker to continue examining him. B.R. withdrew from Dr. Lanker's touch. Dr. Lanker did not observe any marks, trauma, redness, or hemorrhoids in the anal area. Because of B.R.'s reluctance and obvious pain, Dr. Lanker did not perform a rectal exam.

After the examination, Dr. Lanker asked B.R. how long he had been hurting. B.R. stated he had been hurting for two days. When Dr. Lanker asked B.R. if it had ever happened before, B.R. stated yes. When Dr. Lanker asked how many times B.R. had had this problem, B.R. responded for about six weekends. Dr. Lanker asked B.R. "Is what your mother told me true, does your father put his fingers in your bottom, did he stick them in your rectum?" and B.R. replied, "yes." In doing so, B.R. avoided eye contact with Dr. Lanker, looking at the floor and away. When Dr. Lanker later tried to have B.R. re-

peat the statement, B.R. refused to answer him.

When questioned whether a plausible explanation for B.R.'s pain was constipation, Dr. Lanker stated this was a plausible explanation; however, there were not any chronic signs of constipation such as hemorrhoids or fissures. Furthermore, the only complaint children usually have in such situations is of abdominal tenderness and not rectal pain. At the time of the examination, Dr. Lanker was aware B.R. had been prescribed Ceclor and Tylenol with codeine for a prior cold and sore throat. Dr. Lanker testified Tylenol with codeine may cause stomach upset, vomiting, or constipation.

Dr. Lanker stated he has not seen this sort of tenderness on a child's bottom without some sort of direct mechanical irritation. In response to the question whether it was possible the tenderness was a result of normal activities, Dr. Lanker responded, "I do not think so." Dr. Lanker was aware B.R.'s records indicated he had previously been seen at the clinic in August 1987 for rectal pain. Dr. Lanker referred the case to Dr. Beutow and notified the Department of Children and Family Services (DCFS) of possible abuse.

Mary Kathrine Beutow testified she is a pediatrician with Carle Clinic. She examined B.R. on December 5, 1988. Prior to the examination she interviewed Carolyn Roy and B.R. Initially, she observed B.R. to be a friendly, outgoing child. However, when Dr. Beutow asked B.R. to describe visiting his father, B.R. became very upset and did not want to talk anymore. B.R. eventually told Dr. Beutow his father had hurt him. When asked where he had been hurt, B.R. said he had hurt him in his butt with his fingers. At this point, B.R. asked to leave the room and was very distressed. Dr. Beutow persuaded B.R. to remain in the room, and he told her this occurred upstairs in the bedroom and it had happened lots of times. His daddy hurt him in the butt but not in the "weiner." B.R. stated he liked his daddy and his daddy had not threatened him not to tell.

During the physical exam, B.R. was very uncomfortable with the idea of Dr. Beutow looking at his anal area. B.R.'s anus appeared normal and B.R. was not experiencing any of the pain he had earlier complained of. Dr. Beutow diagnosed B.R. as a sexually abused child and recommended treatment.

Dr. Beutow further testified B.R. was suffering from post-traumatic stress syndrome. Dr. Beutow explained post-traumatic stress syndrome may occur when a child has suffered a traumatic experience. The syndrome can manifest itself in several ways. Some children become aggressive and act out. They may be very irritable, crying, having temper tantrums and fears. These children may even

sexually act out. Other children may internalize their feelings trying to deny the acts. These children often become withdrawn, very unhappy, and sad. Dr. Beutow testified a child with post-traumatic stress syndrome may exhibit both extremes of behavior. Dr. Beutow testified B.R. exhibited many of the symptoms of post-traumatic stress syndrome.

Tommy R. Brown testified he is a patrolman with the Monticello police department. He was contacted by DCFS to assist in an investigation of alleged child molestation. On December 1, 1988, Officer Brown contacted defendant and asked to speak with him at the Monticello police department. When defendant arrived, Officer Brown advised defendant of his *Miranda* rights and stated he had contacted defendant in reference to possible abuse of his children. Defendant immediately responded he had not sexually abused his children. Officer Brown advised defendant he had not mentioned defendant was accused of sexually abusing his children. When later asked if he might have done something which could be conceived as sexual abuse, defendant stated his son was having some problems with a rash or something and he had placed medicine on his son's anal area. His mother had also done the same thing. Defendant stated he did help bathe the children, but the extent of his participation was washing their hair. Defendant stated he had never slept with his children or lain in bed with them.

Pam Gremmels testified she is a patient therapist and clinical director at the Piatt County Mental Health Center. Since December 23, 1988, she has been B.R.'s counselor and therapist. She sees B.R. on a weekly basis. She described B.R. as a very sensitive, touchy boy who is resistant to discussions about bathing or beds. She described B.R.'s demeanor as very withdrawn and stated B.R. casts his eyes downward when discussing his father. In her opinion, it would be extremely traumatizing for B.R. to testify at this proceeding.

In the course of her counseling with B.R., Gremmels has utilized a publication known as *Red Flag, Green Flag People*. Gremmels used this publication with B.R. in one session on February 28, 1989. The purpose of the book is to help a child distinguish between a good touch and a bad touch. A "red flag" touch is considered a bad touch and a "green flag" touch is considered a good touch. Gremmels read through the publication with B.R. Gremmels testified she did not supplement the original text. In her opinion, B.R. grasped the concept of a bad touch being a red flag and a good touch being a green flag. Gremmels pointed to pages in the book where B.R. had successfully distinguished between a good and bad touch by coloring the accompa-

nying flag red or green.

Page 14 of the book shows a nude caricature with its body parts labeled. Gremmels read through the body parts with B.R. At the bottom of the page, the text states, "When you are touched and it feels bad, do you get a scared feeling?" To this B.R. responded, "Sometimes, a little bit." He then looked up at Gremmels and said, "I can't see my dad anymore, can I?" Gremmels continued reading the text, which stated, "Is the scared feeling in your stomach, your head, or all over?" B.R. took his index finger and pointed to his bottom. Gremmels read the next line of text, which read, "Have you ever had a red flag touch?" To this, B.R. nodded "yes." The last line of text on page 14 read, "Color the area where you were touched or touched someone and did not like the way it felt." B.R. took a red crayon and drew a vertical line on the back view of the caricature from the anal area up. Gremmels then asked B.R. if he had any other red flag touches and B.R. responded, "yes." Gremmels gave him a xeroxed copy of page 14 of the text. B.R. colored the buttocks of the caricature red and its right hand blue. B.R. indicated the nature of this bad touch had been a spanking by his grandmother.

Effie Brown, the mother of Officer Brown, testified for the defense. She is a neighbor of defendant and his mother and was at their home on Thanksgiving evening when Carolyn brought B.R. and H.R. over. Effie knew the children and they came over to where she was sitting on the couch. B.R. sat on Effie's right side and leaned against her shoulder. Effie asked B.R. if he was tired, and B.R. lay down on his stomach across her lap. Effie patted him on his bottom, and he said, "Don't do that Effie, my butt hurts." Effie, along with two other witnesses, testified to defendant's good reputation.

Christina Roy, defendant's mother, testified defendant has been living with her since his divorce. B.R. and H.R. also stay at her home during their visitation time with defendant. Her home is a two-story house with a living room, two bedrooms, kitchen, and bathroom downstairs. Christina sleeps in the downstairs bedroom, while defendant uses the other small downstairs bedroom for storage. The upstairs contains two bedrooms, one of which defendant uses for his own.

When the children stay over, H.R. usually sleeps on a couch downstairs, while B.R. sleeps in an upstairs bedroom. Defendant would sleep on one of the other couches in the living room or in the other upstairs bedroom. During their visits, the children have never slept with defendant; however, when one of the children was sick, they might sleep with Christina. In May 1988, Carolyn Roy asked Christina not to have B.R. sleep with anyone, as it was too hard to get him to

go to bed by himself at home. Christina agreed with Carolyn's request.

About 6:30 p.m. on Thanksgiving Day, 1988, Carolyn Roy brought B.R. and H.R. over to Christina's home. Christina fixed supper for the children and, with defendant, played games and watched TV. B.R. had not been feeling well and said his back and butt hurt. He told Christina it hurt to go to the bathroom, and she put Desitin on his bottom as a sort of panacea. Christina estimated this occurred about 8 or 9 p.m. and stated no one else applied Desitin to B.R. that evening.

Later that evening, B.R. fell asleep on a couch in the living room, but awoke about 11 p.m. crying. Defendant had to leave for work, and Christina sat up with B.R. until after 1 a.m. when defendant returned. Christina went into her bedroom and defendant lay on the floor in the living room. B.R. was still sitting on one of the couches in the living room and H.R. was asleep on the other.

The next day, B.R. cried off and on stating he needed to go to the bathroom. Christina again applied Desitin to his bottom. Defendant had left for work at 7 a.m. and returned home at about 12 p.m. When defendant arrived, Christina was in the kitchen preparing their dinner. B.R. was in the bathroom. B.R. stated he was still hurting, and Christina asked defendant to put Desitin on B.R.'s bottom. Christina did not actually observe the application; however, she was only six to eight steps away from defendant and B.R.

B.R. continued to be fussy during the afternoon, stating his belly and butt hurt. Carolyn came to pick up the children at about 6 p.m. Christina did not say anything to Carolyn about B.R. having diarrhea, though during the prior visitation he had experienced diarrhea and Desitin was also applied. Christina stated B.R. did cry when his mother came, but she thought it was because B.R. did not want to go home.

Christina testified in May 1988, she did spank B.R. She had just given B.R. and H.R. a bath and was getting them out of the tub. B.R. wrestled H.R. to the floor, held her down and made sexual motions. Christina spanked B.R. and told him not to ever do it again. Christina did not tell anyone of the incident.

Defendant testified he is 26 years old and lives with his mother, Christina Roy. He moved in with her after his divorce from Carolyn. Defendant is employed by Monticello Bus Service, where he drives a school bus and helps maintain and clean charter coaches.

When the children visit, Christina assists defendant in caring for them. For example, when B.R. bathes, he requests Christina be with him. Defendant testified he would wash B.R.'s hair as it was hard for

Christina to bend over. Defendant stated he does not wash other parts of B.R.'s body. In late August or early September 1988, defendant observed a change in B.R.'s attitude toward bathing. B.R. did not want to take a bath and, when told he had to, would become upset and cry.

Defendant had visitation with the children the weekend of November 19 and 20, 1988. Both children had been sick earlier in the week. H.R. seemed to have recovered, though B.R. had a bad case of diarrhea and complained of a stomach ache. Defendant called B.R.'s doctor, Dr. Turngren, on Sunday, the 20th. Dr. Turngren examined B.R. and gave him two types of medication. The medications were Ceclor, which was to help B.R.'s stomach ache and clear up his diarrhea, and Tylenol with codeine for the stomach pain and fever. Dr. Turngren advised defendant there was a possibility Tylenol with codeine could cause constipation.

Defendant's next visitation with the children was Thursday, November 24, 1988. At about 6:30 p.m., Carolyn Roy brought the children to his home. Both children had not had their naps that day and had participated in a previous Thanksgiving celebration. B.R. complained his stomach and butt hurt and he had not been to the bathroom. Defendant testified B.R. was still taking the Tylenol with codeine. Christina would take B.R. to the bathroom, where he would cry and say he could not go. B.R. would request to have Desitin put on his bottom. Defendant testified he only applied Desitin to B.R. on one occasion and that was around 8 p.m. on November 24.

At around 9 p.m. on the 24th, defendant was lying on the floor trying to catch a nap before going to work. H.R. was already asleep on one of the couches in the living room. Christina and B.R. were sitting on the other couch. Christina was trying to comfort and soothe B.R. At about 11:15 p.m., B.R. started to cry and scream that his belly was hurting him. Defendant left for work at 11:30 p.m. and was there for approximately 1 hour and 15 minutes. When he arrived home, B.R. and H.R. were asleep on different couches. Defendant lay down on the floor in the living room, and his mother went into her bedroom. The next morning B.R. was still whining that his stomach hurt. Defendant left for work around a quarter till seven and worked until approximately noon. When Carolyn arrived to take the children home, B.R. ran toward her saying his stomach and butt hurt.

Defendant denied inserting his finger or fingers into B.R.'s anus. Defendant also denied inserting any sort of device into B.R.'s anus. Defendant testified the first time he became aware an allegation of sexual abuse had been lodged against him was when he spoke with

Officer Brown on December 1, 1988. Officer Brown had called defendant prior to the meeting requesting defendant to come and talk with him.

The State and defendant agreed to stipulate to the testimony of Dr. Robert Turngren. If called, Dr. Turngren would testify he is a physician at Carle Clinic and is B.R.'s primary physician. Prior to November 1988, Dr. Turngren had treated B.R. on several occasions. Sexual abuse was not mentioned on any of these occasions. Dr. Turngren saw B.R. on November 20, 1988, and prescribed Ceclor and Tylenol with codeine. Tylenol with codeine can result in constipation, and Ceclor can on occasion cause diarrhea.

On rebuttal, the State called William Schaller and Carolyn Roy. William Schaller testified he is 31 years old and dated Carolyn Roy's sister. He attended the family's 1988 Thanksgiving dinner and observed B.R. there. B.R. played with the other children who were present and did not complain of any health problems. Carolyn Roy also testified B.R. spent Thanksgiving day playing with the other children and did not complain of any health problems. However, B.R. was punching male adults in the groin area.

Defendant alleges the trial court erred in admitting the testimony of Dr. Lanker and Dr. Beutow relaying B.R.'s out-of-court statements. Defendant contends such statements constituted inadmissible hearsay. The State concedes the statements constituted hearsay as they were out-of-court statements offered to prove the truth of the matters asserted. However, admission of the statements was granted pursuant to the hearsay exception for statements by victims of sex offenses to medical personnel. Ill. Rev. Stat. 1987, ch. 38, par. 115—13.

Effective January 1, 1988, section 115—13 of the Code of Criminal Procedure of 1963 (Code) provides:

"In a prosecution for violation of Section 12—13, 12—14, 12—15 or 12—16 of the 'Criminal Code of 1961', statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." Ill. Rev. Stat. 1987, ch. 38, par. 115—13.

B.R.'s out-of-court statements were reasonably pertinent to diagnosis or treatment. B.R. agreed with Dr. Lanker's statement his father put his fingers up his butt and told Dr. Lanker he had been hurting for two days and it had happened before on weekends. B.R.

told Dr. Beutow his father had hurt him in his butt with his fingers. This had occurred upstairs in the bedroom and it had happened lots of times. B.R. further told Dr. Beutow his daddy hurt him in the butt but not in the "weiner." B.R. was examined by Dr. Lanker one day after reporting the incident to his mother. B.R. was examined by Dr. Beutow approximately one week after reporting the incident to his mother. Both doctors made a diagnosis regarding B.R.'s condition and prescribed treatment. In examining and treating a four-year-old child suspected of sexual abuse, details of the sexual acts including how, when, and where the act occurred and who was involved are certainly pertinent. The statute clearly provides for such an admission.

■ Defendant's argument the exception only applies to treating physicians and Dr. Beutow was not a treating physician is erroneous. Section 115—13 does not provide for a distinction between examining physicians and treating physicians. Instead, it provides statements of sexual assault victims to medical personnel for purposes of "diagnosis or treatment" shall be admitted. The reference to diagnosis or treatment evinces a legislative intent to apply this provision broadly and not to limit the testimony only to treating physicians. *People v. Rushing* (1989), 192 Ill. App. 3d 444, 548 N.E.2d 788.

Furthermore, section 115—13 does not deny defendant his confrontation rights. In discussing the admissibility of hearsay statements, courts have frequently relied upon *Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531, which allows the admission of hearsay evidence from an unavailable declarant if the evidence bears adequate indicia of reliability. At issue in *Roberts* was the admissibility of *prior trial testimony* as the State sought to admit preliminary hearing testimony of a witness not produced at the defendant's subsequent State criminal trial. However, the United States Supreme Court in *United States v. Inadi* (1986), 475 U.S. 387, 89 L. Ed. 2d 390, 106 S. Ct. 1121, limited the holding of *Roberts*, stating *Roberts* cannot be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing the declarant is unavailable. Instead, *Roberts* is to be read consistent with the question it answered, the authority it cited, and its own facts. (*Inadi*, 475 U.S. at 394, 89 L. Ed. 2d at 398, 106 S. Ct. at 1125.) Accordingly, the holding of *Roberts* has continuing validity concerning the admissibility of *prior testimony*, but is inapplicable to the case at bar.

■ The constitutional tests set forth in *Inadi* and its successor *Bourjaily v. United States* (1987), 483 U.S. 171, 97 L. Ed. 2d 144, 107 S. Ct. 2775, are applicable to section 115—13. Under these stand-

ards, the unavailability of the declarant need not be shown as long as the evidence (1) has sufficient indicia of reliability (*Inadi*, 475 U.S. at 394, 89 L. Ed. 2d at 398, 106 S. Ct. at 1125), or (2) falls within a firmly established hearsay exception. (*Bourjaily*, 483 U.S. at 183, 97 L. Ed. 2d at 157, 107 S. Ct. at 2782-83.) Though we recognize *Inadi* and *Bourjaily* discuss the admissibility of coconspiracy statements, their principles equally apply to statements made pursuant to section 115—13.

Section 115—13 is a codification of the firmly rooted common law hearsay exception allowing statements describing medical history, symptoms, pain, or sensations made for purposes of medical diagnosis or treatment. The assumption underlying both section 115—13 and the common law exception is that the desire for proper diagnosis or treatment outweighs any motive to falsify. Mere codification of the common law rule does not change these assumptions, nor are they negated when minor children are involved. Section 115—13 meets the constitutional requirements set forth in *Inadi* and *Bourjaily* and clearly does not deny defendant his confrontation rights.

Defendant challenges the appropriateness of Dr. Lanker relaying the statements of Carolyn Roy. Carolyn told Dr. Lanker B.R. would complain of rectal pain when he returned from a weekend with his father and of B.R.'s statement his father put two fingers up his butt. Arguably such statements are not admissible under section 115—13 as they were provided by someone other than the victim. However, hearsay may be relied upon by physicians in making diagnoses. The Handbook of Illinois Evidence provides that under the common law hearsay exception of statements for the purpose of medical diagnosis or treatment, the statement may be made by either a patient or someone with an interest in his well being. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §803.8, at 560 (4th ed. 1984).

■ Here, the trial court admitted this testimony for the limited purpose of its consideration in Dr. Lanker's diagnosis. It does not appear the trial court placed reliance upon the statements themselves. Under these circumstances, we find the admission of these hearsay statements to constitute harmless error.

Defendant further contends the trial court erred in admitting testimony by Dr. Beutow regarding post-traumatic stress syndrome. Defendant contends such admission was lacking in relevance, scientific acceptability, and went to the ultimate issue of fact. Taking the trial court's ruling in context with the preceding arguments, it is obvious the court admitted Dr. Beutow's testimony pursuant to section 115—7.2 of the Code (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 115—7.2).

Section 115—7.2 of the Code (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 115—7.2), effective January 1, 1989, provides:

"In a prosecution for an illegal sexual act perpetrated upon a victim, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, testimony by an expert, qualified by the court relating to any recognized and accepted form of post-traumatic stress syndrome shall be admissible as evidence."

Dr. Beutow testified she is a physician with Carle Clinic and recited her lengthy qualifications. According to Dr. Beutow, post-traumatic stress syndrome is recognized and accepted by the medical profession. Dr. Beutow works with a number of such cases due to her involvement with the child-protection team at Carle Clinic. It was her opinion B.R. suffered from post-traumatic stress syndrome.

■ Dr. Beutow was qualified as an expert, and defendant has not disputed her qualifications. Dr. Beutow testified to the relevance and scientific acceptability of the syndrome and defendant has cited no contrary authority. In *People v. Harris* (1989), 132 Ill. 2d 366, 547 N.E.2d 1241, the Illinois Supreme Court recognized an expert witness may testify to an opinion on an ultimate issue in a case. Section 115—7.2 merely provides for the admission of such testimony. It does not preclude the trier of fact from weighing the witness' testimony and credibility, nor does it obligate the trier of fact to ultimately accept the witness' opinion. Contrary to defendant's assertions, the passage of this statute renders *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131, inapplicable to this case.

Defendant contends the testimony of Carolyn Roy regarding B.R.'s out-of-court statements constitutes inadmissible hearsay. The trial court admitted these statements as spontaneous declarations. Carolyn Roy had repeated B.R.'s statements his butt hurt and his daddy had put two fingers up his butt. B.R. made the statement, "my butt hurts," immediately upon Carolyn's arrival at defendant's home on November 25, 1988. B.R.'s statement, "daddy put two fingers up my butt," was made approximately two to three hours later at their own home.

■ To bring a statement within the spontaneous declaration exception to the hearsay rule, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) In determining whether a

statement is admissible as a spontaneous declaration, the trial court has considerable discretion. Its decision will not be reversed absent an abuse of that discretion. *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.

The first and third required factors of a spontaneous declaration are clearly met in this case. B.R.'s statements, "my butt hurts," and "my daddy put his two fingers up my butt," clearly relate to the circumstances of the occurrence. Furthermore, such an occurrence would be sufficiently startling as to produce a spontaneous declaration. Direct proof of the occurrence is not strictly necessary, as circumstantial evidence corroborating the existence of the shocking event is sufficient. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 503 N.E.2d 1132.) Here, the observations and diagnoses of Dr. Lanker and Dr. Beutow provide sufficient corroborating evidence.

Regarding the remaining factor, absence of time to fabricate, time alone does not control the admissibility of the utterance but rather the critical factor is the lack of opportunity to fabricate. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395.) The trial court must look to the surrounding circumstances to determine whether there was an opportunity for reflection and invention. *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292.

B.R. did not have sufficient time or opportunity to fabricate. The information alleges the sexual act occurred in November 1988; however, the testimony at trial focused on the visitation with defendant from November 24 through November 25. B.R. made the statement, "my butt hurts," upon immediately seeing his mother on the 25th. The evidence shows B.R. remained in a withdrawn mood from leaving defendant's home through the later conversation with his mother two or three hours later. B.R. made the statement, "my daddy put two fingers up my butt," on the first occasion he had to be alone with his mother.

In determining B.R.'s statements are unfabricated, we recognize the rationale set forth in *People v. Bitler* (1986), 146 Ill. App. 3d 477, 497 N.E.2d 137, that it is unlikely a child of tender years would have any reason to fabricate stories of sexual abuse. Their statements may remain void of fabrication for a longer period of time because the child is apt to repress the incident; it is often unlikely the child will discuss such a stressful incident with anyone other than the mother; and the characteristics of young children work to produce declarations free of conscious fabrication for a longer period after the incident than adults.

The fact B.R. made the statement, "my daddy puts two fingers

up my butt," in response to Carolyn's questioning on what was wrong with B.R. or why did his butt hurt does not disqualify these statements as spontaneous declarations. Though one of the circumstances to be taken into account is whether the statement was made voluntarily or in response to a question, it is well established asking the declarant what happened is insufficient to destroy the spontaneity of a response. *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25; *Sanchez*, 105 Ill. App. 3d at 491, 434 N.E.2d at 398.

Defendant further alleges the trial court erred in admitting the testimony of Pamela Gremmels regarding statements and actions of B.R. and in admitting the *Red Flag, Green Flag People* publication. Gremmels' testimony was admitted pursuant to section 115—10 of the Code (Ill. Rev. Stat. 1987, ch. 38, par. 115—10) and consisted of B.R.'s responses to the *Red Flag, Green Flag People* publication. Prior to trial, the State filed notice of its intent to present Gremmels' testimony.

Section 115—10, effective January 1, 1988, states:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement.

(c) If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and ma-

turity of the child, the nature of the statement, the circumstances under which the statement was made, and any other relevant factor.

(d) The proponent of the statement shall give the adverse party reasonable notice of his intention to offer the statement and the particulars of the statement." (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.)

We interpreted this statute in *Rushing* (192 Ill. App. 3d at 451, 548 N.E.2d at 792) as allowing into evidence the detailed testimony of the person to whom the child complained. However, unlike *Rushing*, no hearing was held to establish the reliability of the statements and the child did not testify.

As provided above, the statute requires the court to conduct a hearing "outside the presence of the jury" to determine whether the time, content, and circumstances of the statement provide sufficient safeguards of reliability. (Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(1).) However, beyond generally objecting to Gremmels' testimony, defendant has not objected to the absence of this hearing or determination. We review this issue only to determine whether it constitutes plain error.

██ The requirement the hearing be held "outside the presence of the jury" does not render the requirement inapplicable to bench trials. However, it is a well-established rule that the trial court, as a trier of fact, is presumed to have only considered admissible evidence in reaching its determination. (*People v. Finn* (1978), 68 Ill. App. 3d 126, 385 N.E.2d 103.) Accordingly, we find that in admitting Gremmels' statements into evidence the trial court appropriately considered the time, content, and circumstances of the statements were sufficient to establish their reliability even though it did not articulate such a finding. While the trial court should have made such a specific finding, its absence does not constitute plain error under these circumstances.

The statute further provides for the admission of out-of-court statements of the child victim even when the child does not testify. As previously set forth, this provision allows the out-of-court statements if the child is "unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement." Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(2)(B).

██ B.R. did not testify at trial, nor was he subject to cross-examination. No findings or stipulations were made regarding his unavailability. Both the State and counsel for defendant referred to his assumed unavailability. In her testimony, Gremmels stated it would be

extremely traumatizing for B.R. to testify. Again, beyond generally objecting to Gremmels' testimony, defendant has not objected to B.R.'s unavailability or raised it as an issue on appeal. Accordingly, we will not address the issue further.

Concerning the element of corroboration, B.R.'s statements were sufficiently corroborated. Dr. Beutow diagnosed B.R. as being sexually abused, and Dr. Lanker testified B.R.'s anal tenderness could only be the result of a mechanical irritation.

■■■ Regarding Gremmels' testimony, defendant has not alleged his confrontation rights were denied. However, defendant has made such a general allegation in other portions of his brief. We do not find this statute violates defendant's confrontation rights. Again, we adopt the rationale of *Inadi* and *Bourjaily* that the unavailability requirement of *Roberts* is not mandated by the Constitution and the hearsay statements are admissible as long as the evidence (1) has sufficient indicia of reliability, or (2) falls within a firmly established hearsay exception.

Section 115—10 is not a firmly rooted hearsay exception. However, the statute does guarantee sufficient indicia of reliability. Prior to admitting the evidence, the statute requires the trial court find that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. (Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(1).) Moreover, when the child is unavailable to testify, the statute requires corroborative evidence of the act which is the subject of the statement. Ill. Rev. Stat. 1987, ch. 38, par. 115—10(b)(2)(B).

It should be noted that the application of *Inadi* and *Bourjaily* to section 115—10 does not minimize the additional statutory safeguards required when the child is unavailable to testify. *Inadi* and *Bourjaily* interpret the confrontation rights guaranteed defendant by the United States Constitution. The State of Illinois can statutorily provide defendant more rights than he is entitled to under the United States Constitution. These additional statutory rights are not affected by our ruling here.

■■■ The trial court did not err in admitting the publication *Red Flag, Green Flag People*, or the photocopies of its pages on which B.R. drew. The admission of such evidence does not necessarily require scientific data, studies, or research regarding its reliability. The trial court can appropriately consider the weight to be given such evidence from the testimony at trial. The trial court admitted the publication for the limited purpose of corroborating the fact B.R. received an offensive touch. Though B.R.'s drawings constitute admissible hearsay pursuant to section 115—10 and not corroborative evidence,

we do not find the trial court erred in its admission.

Last, defendant contends he was not proved guilty beyond a reasonable doubt. In making this allegation, defendant contends the evidence against him was conflicting and inadequate and questions the credibility of his ex-wife, Carolyn Roy. Defendant cites common law standards, such as, "[a] charge of sexual assault is easy to make but difficult to disprove" and "the complainant's testimony must be clear and convincing or corroborated by other evidence." *People v. Laughlin* (1987), 163 Ill. App. 3d 115, 123, 516 N.E.2d 535, 540.

We now state the standards cited by defendant are invalid and a reflection of archaic and sexist views. (See *People v. Cole* (1990), 193 Ill. App. 3d 990, 997, 550 N.E.2d 723, 728 (Steigmann, J., specially concurring).) Based upon eighteenth-century insight, Lord Hale originated the maxim rape "is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho ever so innocent." (I M. Hale, Pleas of the Crown 635 (1778).) This rationale ultimately evolved into the rule that evidence in a sex offense case must be substantially corroborated or the testimony of the victim must be clear and convincing.

■■■ However, there is no additional requirement that in a case in which a sex offense is charged the State must, in addition to proving the defendant guilty beyond a reasonable doubt, demonstrate either the evidence is substantially corroborated or the victim's testimony is clear and convincing. The testimony of no other category of crime victim is held to be automatically suspect or to require additional proof beyond the statutory requirements. The time has passed to rid the law of this sexist anachronism. The standards cited by defendant are inapplicable and unnecessary.

■■■ The trial court did not err in finding defendant guilty. In making its finding, the trial court specifically noted the lack of evidence of fabrication or opportunity to fabricate on B.R.'s part; the observations and diagnoses of Dr. Lanker and Dr. Beutow; B.R.'s statements to Carolyn Roy and Pam Gremmels; defendant's statement to Officer Brown he had not sexually abused his children—prior to any mention of sexual abuse; and the demeanor, credibility, and interest of all the witnesses.

■■■ The resolution of factual disputes and the assessment of the credibility of witnesses are for the trier of fact. The reviewing court will not reverse a conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to defendant's guilt remains (*People v. Wise* (1984), 128 Ill. App. 3d 330, 470 N.E.2d 1155 (employing the standard stated in *People v. Collins* (1985), 106 Ill. 2d 237,

261, 478 N.E.2d 267, 276-77)). (*People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344, 346.) Here, the evidence was sufficient for the trial court to find defendant guilty beyond a reasonable doubt.

Affirmed.

SPITZ and STEIGMANN, JJ., concur.