THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN USELDING, Defendant-Appellant.

First District (5th Division)    No. 1—88—3338

Opinion filed July 19, 1991.

1064

Law Offices of Terry Sullivan, Ltd., of Rolling Meadows (Nancy J. Nicol, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth McCurry, and David Meyerson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a bench trial, the defendant, John Uselding, was convicted of aggravated criminal sexual abuse of his granddaughter (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(b)), and sentenced to three years' conditional discharge. Defendant appeals, contending that he was not proven guilty beyond a reasonable doubt, that the State failed to disclose information which tended to negate his guilt in violation of Illinois rules of discovery, and that he was deprived of his constitutional right to effective assistance of counsel. For the reasons set forth below, we affirm.

FACTS

There is no dispute that at the time in question, February 4, 1987, the complainant, C., was 13 years old and in the eighth grade. C., her sister Debbie and brother John had lived with their grandparents for approximately eight years following the divorce of their parents. C. testified that on February 4 she arrived home from school at approximately 3:20 p.m. The defendant, her grandfather, was the only person home. C. testified that when she arrived home, defendant said it was "showtime," which she understood from past experience to mean that he was going to "fool around" with her. C. went upstairs to change her clothes, and defendant began to follow her. At that point, her grandmother, Bernice Uselding, and Pastor McMahon arrived at the house. C. continued upstairs to change from the dress she had worn to school into pants, while the defendant joined his wife and the pastor in the kitchen. The pastor left after 5 or 10 minutes. At about 3:35, Bernice Uselding also left to pick up Debbie at school and to pick up dinner at a nearby Arby's.

According to C., after the grandmother left, defendant told C. to go upstairs to the bathroom, which she did. He followed her, removed her clothes, and fondled her for approximately 10 minutes. The defendant then went to the downstairs bathroom, and C. heard the toilet flush a few seconds later. She got dressed and went downstairs to do her homework. The complainant's brother John arrived home at about 4 p.m., and sometime after that Bernice Uselding and Debbie returned with food for dinner. The family ate Arby's sandwiches for dinner that evening.

C. further testified that later that evening her school friend Karen Carlson called her. C. told Karen that "it happened again," and asked Karen to tell a counsellor at school about what was happening, which Karen did on February 6, 1987. C. testified that other such incidents

of sexual abuse by the defendant had occurred in the past, and that several months earlier, she had told Karen of one such incident involving the defendant.

On cross-examination, C. admitted that prior to the time of the alleged incident she had had some disagreements with her grandparents about their strict discipline and rules. She further stated that the day after the incident she told her father that she no longer wanted to live with her grandparents and that she wanted to live with her friend Karen. However, she denied that she made these accusations against her grandfather in order to escape the house. On redirect, C. said that after making the allegations against her grandfather, other family members harassed her and called her a liar.

Karen Carlson, C.'s friend, also testified for the prosecution. She said that when she called C. in the evening on February 4, 1987, she noticed something unusual in C.'s voice. When asked what was wrong, C. responded "it happened again." Karen said that, based on something C. had told her several months earlier, she believed that C.'s remark related to C.'s grandfather. Karen verified C.'s testimony that C. asked her to tell the counsellor at school what was happening, which Karen did two days later. Following Karen's testimony, the State rested.

The defendant's wife, Bernice Uselding, testified for the defense as to her recollection of the events of February 4, 1987. Her testimony with respect to times of arrival and departure and destinations that afternoon differed from that of the complainant. According to Bernice Uselding, she and the pastor arrived at the house at 3:10, and C. returned from school at 3:15. The pastor left a few minutes past 3:30, after making a telephone call to inform his 3:30 appointment that he was running late. Mrs. Uselding then told her husband to warm up some soup, put biscuits in the oven and set the table for dinner. She left the house at 3:40 to pick up Debbie and Debbie's friend Rosalia Affatigato from high school. The round trip to the high school takes seven to eight minutes.

According to Mrs. Uselding, she and Debbie returned home at approximately 3:50, after dropping off Rosalia at her house 1½ blocks from the Uselding house, and making no other stops. When they arrived, C. was doing her homework, John had returned from school and the table had been set. The family sat down to dinner a few minutes before 4 p.m. She further stated that she did not stop at any Arby's before returning home and that they did not have Arby's sandwiches for dinner. Mrs. Uselding testified that she noticed nothing unusual in C.'s behavior that evening.

Mrs. Uselding also testified as to the events of February 6, 1987. On that day her husband was contacted by the police, and she accompanied him to the station where they were told of the accusations made by C. When Mrs. Uselding saw C. at the station, C. was laughing with her friend Karen. Mrs. Uselding also testified that when she took C. to the hospital for an examination that evening after the defendant's arrest, C. said "I knew they wouldn't find anything wrong with me. Just get Grampy to admit it and I can go live by Karen." Several weeks after the incident, C. ran away to Karen's house after a disagreement with Mrs. Uselding about C. going to a party. C. told her grandmother that she no longer wanted to stay in the house. Mrs. Uselding had her admitted to the hospital.

On cross-examination, Bernice Uselding testified that on the day in question her grandson John was due home from school at 3:40. John attended special education classes, and it was necessary that someone be home when the school bus dropped him off. Mrs. Uselding said that she was usually the one who would meet him when the bus arrived. She could not explain why her husband did not go to pick up Debbie from high school that day, which would have permitted her to be home when John arrived.

The next witness was C.'s sister, Debbie. She testified that Mrs. Uselding picked up Rosalia and her at 3:46, and after dropping Rosalia off, she and her grandmother went directly home and arrived there at 3:51. Debbie said that she and her sister had a close relationship in the past, but that it had deteriorated since the occurrence of the events which led to defendant's arrest. Debbie also testified that in December 1986, C. had said she wanted to live with Karen's family because they were not as strict as her grandparents. According to Debbie, C. had complained of her grandparent's rules on many occasions.

On cross-examination Debbie testified as to a conversation she had with C. the night of February 4, 1987. When the girls were in bed in the room they shared, C. told Debbie that "it happened again." Debbie interpreted this to refer to what C. had told her in November 1986, that their grandfather had been touching C. According to Debbie, she told no one about C.'s November disclosure because of her promised silence to her sister.

C.'s aunt and uncle, Louise and Richard Wacker, the defendant's daughter and son-in-law, also testified for the defense. They both said that prior to February 4, 1987, C. had told them that she wanted to live with Karen rather than with her grandparents, who, C. felt, were too strict. Louise Wacker also testified that she had been C.'s Girl

Scout leader, and that C. had a reputation among the troop members as a liar and a cheat.

Pastor McMahon testified that he had been at the Uselding's house on the afternoon of February 4, 1987, for a total of about five minutes. He could not remember the exact time he and Mrs. Uselding had arrived. He surmised that he arrived after 3:10, since he remembered making a telephone call to explain that he would be late for his 3:30 appointment, which, considering the short duration of his stay at the Uselding house, would have not been necessary had they arrived by or before 3:10.

John Uselding, the defendant, testified on his own behalf. He acknowledged that his wife had assisted him in reconstructing the events of that day, and his testimony as to the times the various parties arrived and left the Uselding home agreed with her earlier testimony. He further testified as to what had occurred while he and C. were alone in the house. He said that he prepared the dinner and set the table as his wife had instructed him to do. When he heard footsteps upstairs, he took two steps up the stairs and saw C. come out of the bathroom naked. According to the defendant, "I took a swipe at her bare butt and just nipped it with the end of my three fingers, and I told her to get in there and get some clothes on." The defendant specifically denied touching C. in the way she had testified.

In addition, the defense presented three character witnesses for the defendant, one of whom was Maria Affatigato, Rosalia's mother.

The State presented three witnesses in rebuttal. Two character witnesses, former teachers of C., testified that they had never heard any negative comments about C.'s character. Judy Carlson, Karen's mother, testified that at the police station the evening of February 6, Bernice Uselding asked C. why she had not told her what had happened, to which C. replied "you wouldn't have believed me." According to Mrs. Carlson, Bernice Uselding responded, "[W]ell, I want him out. I want him out of the house. They can take him from the police station and they can take him to the hospital, right to the hospital. I want him fixed. He can't come into the house until he's fixed."

Following a bench trial, the defendant was convicted of aggravated criminal sexual abuse of his granddaughter. Defendant filed a post-trial motion seeking a new trial or, alternatively, a judgment notwithstanding the verdict, alleging, *inter alia*, the same grounds he argues on appeal here. With that motion, he submitted the affidavit of Rosalia Affatigato in which she stated that two men from the State's Attorney's office had come to her home to interview her concerning the events of February 4, 1987, and outlining the substance of what

she told them. Defendant's post-trial motion was denied, and he was sentenced to three years' conditional discharge. From the conviction and the denial of his post-trial motion, defendant appeals.

OPINION

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because his conviction was based solely on the testimony of C., which was neither clear and convincing nor corroborated by other evidence. He also argues that the contradiction between C.'s testimony that she was alone with the defendant for approximately 25 minutes and that of the defendant and his wife that Bernice Uselding was gone for less than 10 minutes raises a reasonable doubt as to guilt. The State counters that, when all testimony is viewed in the light most favorable to the prosecution, there was sufficient evidence to find guilt beyond a reasonable doubt.

■■ ■ As a reviewing court presented with a challenge to the sufficiency of evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) It is not our role to ask whether we believe that the evidence presented at trial established guilt beyond a reasonable doubt. "In a bench trial, it is the province of the trial court to determine the credibility of the witnesses and weigh the evidence." (*In re C.P.* (1986), 141 Ill. App. 3d 1018, 1023, 491 N.E.2d 44, 48.) If, after giving due consideration to the fact that the trial court saw and heard the witnesses and after viewing the evidence in the light most favorable to the prosecution, we find the evidence to be insufficient to remove all reasonable doubt as to defendant's guilt, only then may the conviction be reversed. (*People v. Young*, 128 Ill. 2d at 48, 538 N.E.2d at 472.) Based upon our review of the record before us, we are convinced that there exists sufficient evidence by which a rational fact finder could have found the defendant guilty beyond a reasonable doubt.

The evidence showed that C. and the defendant were alone in the house while Bernice Uselding went to pick up Debbie and Rosalia from high school. Both sides went to great lengths to reconstruct the exact time each person arrived or left the Uselding home, as a key question in this case was whether the defendant and C. were alone for a sufficient period of time for the alleged abuse to occur. There

was conflicting testimony on this point. C. testified that she was alone with the defendant from approximately 3:35 until 4. The defendant and his wife both testified that C. and the defendant were alone only from 3:40 until 3:51. The defense also directs our attention to the discrepancy in testimony as to what the family ate for dinner on the night in question. C. testified that the family ate Arby's sandwiches, while all other family members said they ate soup and biscuits. The defendant contends that the question of the dinner menu is significant since C. testified that her grandmother was out of the house for 25 minutes because the grandmother went to Arby's before returning home. The defense, on the other hand, contended that without stopping at Arby's, Bernice Uselding was gone for less than 10 minutes.

■ Where evidence is merely conflicting, we will not substitute our judgment for that of the trier of fact. (*People v. Puente* (1984), 125 Ill. App. 3d 152, 157, 465 N.E.2d 682, 687.) Resolution of this discrepancy necessarily turned on the credibility of the witnesses, and the trial court was free to believe either the testimony of C. or that of the defendant and his wife. While the trial court stated that it did not feel that any of the defense witnesses deliberately lied under oath, its finding of guilt indicates that it gave credence to C.'s testimony, at least insofar as it showed that C. and the defendant were alone for a sufficient period of time. Moreover, we note that the trial judge, in ruling on defendant's post-trial motion, expressly stated that he had considered all testimony regarding time to be approximations, and that he found there to have been sufficient time for the abuse to have occurred.

■ While C.'s testimony as to the actual abuse was contradicted by the defendant, who denied that any such abuse occurred, this does not by itself raise reasonable doubt as to guilt. Our supreme court has stated that "[t]he testimony of a single credible witness is sufficient to convict notwithstanding contradictory testimony by the accused, and the trial judge's determination will not be lightly set aside." (*People v. Sullivan* (1970), 46 Ill. 2d 399, 401, 263 N.E.2d 38, 39.) Although there exist discrepancies in the testimony, they do not rise to a level sufficient to justify the substitution of our judgment for that of the trial court. C.'s story was unwavering, and she maintained it even in the face of hostility from members of her own family. She did not contradict herself on cross-examination. In addition, her testimony as to prior and contemporaneous complaints of abuse was corroborated by her sister and friend. Also, the testimony of Pastor McMahon as to the times he arrived and left the Uselding house tended to lend credibility to C.'s recollection of events, while also detracting from the

credibility of the defense witnesses. We also note that the credibility of the defendant and his wife may have been adversely affected by the defendant's admission that together he and his wife reconstructed their accounts of February 4, 1987. Further, Bernice Uselding's statement at the police station following defendant's arrest that she wanted him out of the house until he was "fixed" would also seem to indicate that, notwithstanding her testimony that on the day in question she was out of the house for only 10 minutes, she was nevertheless willing to believe her husband's guilt for the acts complained of that afternoon.

■■ The defendant, however, urges that his conviction may be upheld only if there is corroboration of the testimony of the complaining witness or if the complainant's testimony is otherwise clear and convincing. We disagree that the clear and convincing standard is the proper one to be utilized upon review. The standard which defendant proposes has been characterized as "a reflection of archaic and sexist views" and a "sexist anachronism" which, as such, should be abandoned. (*People v. Roy* (1990), 201 Ill. App. 3d 166, 185, 558 N.E.2d 1208, 1221.) Several recent cases have held that, in cases of sexual assault, as in all other criminal cases, the State need only prove the defendant guilty beyond a reasonable doubt. There is no additional requirement that when a sex offense is charged, the State must meet any other burden. See *People v. Hart* (1991), 214 Ill. App. 3d 512, 520 (and cases cited therein).

■■ However, were clear and convincing the correct standard, we believe it has been met in this case. Although defendant contends that C.'s testimony was not clear and convincing because it was contradicted by other testimony, testimony of the complaining witness need not be uncontradicted in order to be considered clear and convincing. (*People v. Priola* (1990), 203 Ill. App. 3d 401, 412-13, 561 N.E.2d 82, 91.) Testimony may be considered clear and convincing if it is consistent, unwavering, and unshaken on cross-examination. (*People v. Deal* (1989), 185 Ill. App. 3d 332, 337, 541 N.E.2d 695, 698.) Contradictions or discrepancies which do exist may affect the credibility of the complainant, but do not preclude the testimony from being considered clear and convincing. (*Priola*, 203 Ill. App. 3d at 412-13, 561 N.E.2d at 91.) As discussed above, C.'s testimony on direct and cross-examination was consistent and unwavering. The only contradictions to C.'s testimony came from the witnesses for the defendant. Their testimony, however, does not affect the clear and convincing nature of her testimony.

■ Defendant further asserts that there was no corroboration of C.'s testimony, as there were no eyewitness accounts, no confession by defendant and no medical evidence. We agree with the defendant that the type of corroborative evidence he suggests is lacking here. In a case such as this, there rarely are eyewitnesses. The same holds true for a confession by the defendant. Lack of medical evidence is also not surprising in a case such as this, where the charge against the defendant was that he fondled the victim. Defendant, however, in listing the type of corroboration which is absent here, omits corroboration by prompt complaint by the victim, which is present. (*People v. Thompson* (1990), 198 Ill. App. 3d 417, 419, 555 N.E.2d 1122, 1124.) C.'s sister Debbie and her friend Karen both testified that on February 4, 1987, C. told them that "it happened again," which both girls took to mean something involving the defendant. Both Debbie and Karen also testified as to C.'s complaint in November, which although not directly corroborative of the incident in question, does tend to corroborate C.'s veracity. We note that although Karen was a witness for the prosecution, Debbie was called by the defense, and her testimony nevertheless corroborated C.'s testimony. Karen also testified that C. asked her to tell a counsellor at school, which Karen did two days later. Further, Pastor McMahon's testimony that he and Bernice Uselding arrived at the Uselding house closer to 3:30, as C. contended, than to 3:10, as the defendant and his wife testified, also lends some additional credence to C.'s testimony. However, under the clear and convincing standard which defendant proposes, it is only when the complaining witness' testimony falls short of being clear and convincing that any corroboration at all is required. (See *People v. Findlay* (1988), 177 Ill. App. 3d 903, 532 N.E.2d 1035.) Where, as here, we have held that the complaining witness' testimony was clear and convincing, we need not be further concerned with the sufficiency of the corroborative evidence presented in the record even if we held the clear and convincing standard were applicable.

■ ■ Defendant also contends that he is entitled to a new trial due to the State's failure to disclose information which tended to negate his guilt. He alleges that by its actions, the State has violated the rule of *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, as well as Illinois Supreme Court Rules 412(c) and 415 (107 Ill. 2d Rules 412(c), 415). He bases this assertion on the fact that he learned, after the trial, that two assistant State's Attorneys had interviewed Rosalia on July 28, 1987, concerning the events of February 4, 1987. According to Rosalia's affidavit which was submitted with defendant's motion for a new trial, she told them that Bernice

Uselding picked up Debbie and Rosalia from school at 3:41. Mrs. Uselding drove directly to Rosalia's house, a trip of approximately four minutes. Rosalia also said that they did not stop at Arby's or anywhere else on the way. Defendant argues that Rosalia's statement corroborated the testimony of the defendant, his wife, and Debbie, and also impeached the testimony of C. As a result, he urges that it would tend to negate his guilt and therefore the State's failure to disclose the information requires the granting of a new trial. The State, however, argues that defense counsel knew from the beginning of Rosalia and what she could testify to at trial and, furthermore, that her testimony would have had no effect on the outcome of the case. We find the State's position to be more persuasive.

In *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The standard under Illinois Supreme Court Rules 412(c) and 415 (107 Ill. 2d Rules 412(c), 415) is coextensive with that set forth in *Brady* under considerations of Federal due process. (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 255, 564 N.E.2d 850, 866; *People v. Lann* (1990), 194 Ill. App. 3d 623, 632, 551 N.E.2d 276, 282.) The crucial question under both the Federal constitution and under Illinois Supreme Court Rules 412(c) and 415 is whether the undisclosed information was material in a constitutional sense. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383. Accord *Gutirrez*, 205 Ill. App. 3d 231, 564 N.E.2d 850; *Lann*, 194 Ill. App. 3d 623, 551 N.E.2d 276.) The defendant has failed to demonstrate any probability that had the State revealed the fact and substance of the interview with Rosalia, the result of the proceeding would have been different.

The information in Rosalia's affidavit was at best cumulative of other testimony by defense witnesses. Both Bernice Uselding and Debbie testified that Mrs. Uselding picked up Debbie and Rosalia from school that afternoon. They also testified that they drove directly from the school to Rosalia's house, making no stops at Arby's or anywhere else on the way. Furthermore, Rosalia's statement conflicted detrimentally in certain respects with the testimony of Bernice

Uselding and Debbie. Rosalia stated that Mrs. Uselding picked them up at 3:41, while Debbie stated that they were picked up at 3:46. Also, in order to pick up the girls at 3:41 as Rosalia stated, Mrs. Uselding would have had to leave the Uselding house earlier than 3:40 as she testified she did, since the round trip to the school takes seven or eight minutes. In this respect Rosalia's testimony would be more consistent with C.'s testimony that her grandmother left the house at 3:35 that afternoon. Moreover, contrary to defendant's assertion, Rosalia's statement does not truly discredit that portion of C.'s testimony that the family had Arby's sandwiches for dinner. While Rosalia said that Mrs. Uselding did not stop at Arby's before dropping Rosalia off, she had no way of knowing whether Mrs. Uselding and Debbie went to Arby's after dropping Rosalia at her house.

Our finding that defendant suffered no prejudice by the State's failure to inform defense counsel of their interview with Rosalia is further supported by remarks made by the trial judge in considering this contention when it was raised in defendant's post-trial motion. In denying the motion, the trial judge explicitly denied that his determination would have been impacted had Rosalia testified to the contents of her affidavit, stating "I don't think my decision in any way had anything to do—I frankly believe that Debbie was picked up by the grandmother and that the Affatigato girl was there. I never questioned that. *** But I felt in my rulings that there was sufficient time for the allegations to have occurred because all of the times testified to were approximations and it certainly left enough time."

Defendant's final ground of appeal concerns the effectiveness of representation at trial. Here he again contends that had the testimony of Rosalia been presented at trial it would have corroborated other defense witnesses and contradicted C.'s testimony, and that his counsel's failure to interview or call Rosalia as a witness deprived him of his constitutional right to effective assistance of counsel. The State maintains that counsel's failure to call Rosalia as a witness was a tactical decision, and further that the defendant suffered no prejudice as a result.

A defendant has been deprived of effective assistance of counsel if his counsel's representation fell below an objective standard of reasonableness and if the defendant suffered actual prejudice as a result. (*People v. Nitz* (1991), 143 Ill. 2d 82, 108-09, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) In reviewing counsel's conduct, great deference must be given to trial counsel's conduct, and we will not review matters involving the exercise of judgment, discretion, or trial tactics. (*People v. Mitch-*

*ell* (1984), 105 Ill. 2d 1, 12, 473 N.E.2d 1270, 1275.) Here there can be little question that defense counsel knew of Rosalia's existence as a potential witness. Two defense witnesses, Bernice Uselding and Debbie, testified that Rosalia had been with them during a portion of the times here in issue. However, as discussed above, Rosalia's testimony would have been largely cumulative and would also have conflicted detrimentally to a certain degree with that of other defense witnesses. Failure to call her, therefore, was a matter of counsel's judgment as to trial tactics, and we will not second-guess that judgment. We also note that, for the same reasons previously discussed in regard to the contentions arising from the State's failure to disclose its interview with Rosalia, defendant suffered no prejudice as a result of his counsel's failure to call Rosalia as a witness. Accordingly, we conclude that this claim must also fail.

Finally, pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, and *People v. Agnew* (1985), 105 Ill. 2d 275, 473 N.E.2d 1319, we grant the People's request that defendant be assessed $50 as costs for the People for defending this appeal and $25 for oral argument and incorporate it as part of the judgment.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MURRAY and McNULTY, JJ., concur.