THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESSE JAMES, JR., Defendant-Appellant.

Fourth District No. 4—88—0936

Opinion filed August 2, 1990.

Daniel D. Yuhas and M. Jeffrey Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Kevin T. McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Defendant Jesse James, Jr., was charged by indictment with attempt (aggravated criminal sexual assault) (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 12—14(a)(1)) alleging defendant, while displaying a

knife, attempted to rip the clothes off of K.S. with the intent to place his penis in her vagina. Following a jury trial, defendant was convicted of this offense and sentenced to 25 years' imprisonment. On appeal, defendant contends: (1) the trial court erred in admitting into evidence a statement made by K.S. to Ken Peterson and Michelle Scogin; (2) the trial court erred in admitting the testimony of Frank Ford concerning a statement made by defendant three months prior to the offense; (3) the trial court erred in refusing to instruct the jury on attempt (aggravated sexual abuse), aggravated battery, and attempt (criminal sexual assault); (4) defendant was denied a fair trial when the State's closing argument improperly summarized evidence and shifted the burden of proof to defendant; and (5) defendant was not proved guilty beyond a reasonable doubt. We affirm.

The victim in this case, K.S., has been deaf her whole life and can speak very little. K.S. can read lips when spoken to slowly, but has difficulty understanding statements which are spoken at normal speeds. Jenny Singleton was qualified and appointed by the court to act as interpreter and translator for K.S. during the course of the jury trial.

On February 21, 1988, K.S. and her husband, Terry, visited one of Terry's friends who lived three or four blocks from K.S.'s residence. K.S. testified she knew the friend only by the name of "Charles" or "Chips." After staying part of the afternoon, K.S. and her husband left in Chips' car. K.S. was subsequently dropped off at her home while her husband left with a man named Willie.

When her husband did not return in time for dinner, K.S. became worried he was drinking and driving. She walked to Chips' house to see if Chips would help her look for her husband. Upon finding Chips at home, K.S. communicated with him by writing a note, and Chips responded he would help. Because her husband had Chips' car, Chips went to speak with defendant about borrowing his car for their search. Defendant subsequently drove them to Willie's house and then back to Chips' house.

K.S. testified a person named Cliff arrived at Chips' house and that the four of them, K.S., Cliff, Chips, and defendant, sat at the kitchen table. They communicated with K.S. by writing notes back and forth in a notebook. Shortly thereafter, K.S. left the residence in defendant's car with Chips, Cliff, and defendant. Defendant was driving the vehicle and he dropped Cliff off at his home. It was K.S.'s impression the three of them were then going to Chips' girlfriend's house. On the way there, defendant and Chips were talking about something; however, K.S. was unable to read their lips. K.S. testified

Chips was sitting in the backseat and defendant was talking to him over his shoulder. Chips subsequently got out of the car, leaving only K.S. and defendant inside. Defendant began driving very fast and, though he was talking to her, K.S. could not understand him. K.S. stated defendant ultimately stopped at a trailer, at which time K.S. thought he was going to use the phone.

K.S. and defendant got out of the car and entered the trailer. Defendant slammed the door behind them, locking it. K.S. tried to leave the trailer, but defendant would not allow her to. Defendant grabbed her, pulled her down, and tore at her coat. After defendant ripped K.S.'s coat open, he said, "I will rape you." K.S. stated she could read his lips when he said this statement as she was on the floor and he was right up in her face. Defendant next stated, "I'll kill you." K.S. testified she pushed and screamed, trying to get defendant off of her. Defendant held his hand over her mouth and kept saying to shut up. When defendant removed his hand from her mouth, he placed a knife in her mouth. K.S. felt a cut and saw blood.

After defendant left the trailer, K.S. walked toward the neighboring trailers. Upon finding two people inside a car parked at another trailer, she tried to explain to them what had happened. The couple gave her a piece of paper to write on, and K.S. wrote a note indicating she needed to go home. In response to the question "What's wrong?" she wrote, "the black man try rape and knife." K.S. testified it was hard for her to write as she was nervous and shaking. The couple gave her ice for her mouth and took her home. K.S. testified it was about 1 a.m. when the couple brought her home and neither she nor her husband called the police that night because her husband wanted to wait until the morning to do so. K.S. testified when she and her husband went to the police station the next morning, she identified defendant's photo as depicting the person who had assaulted her.

K.S. further testified that when she first spoke with the police about the incident, she only told them part of the truth. K.S. did not tell the police she was with Chips, Cliff, and defendant prior to the offense because she was afraid her husband would be mad she went out looking for him. K.S. testified her husband later found out she had been looking for him and told her she needed to tell the police the truth. The first story K.S. told the police was that a man had passed her on the street, grabbed her, and threw her in his car.

Terry testified on February 21, 1988, he and his wife, K.S., went to Charles "Chips" Thomas' house in Urbana. Terry testified he subsequently dropped K.S. off at their home and used Chips' car to go

out drinking with a friend named Willie. Terry testified he did not get home until close to midnight and that K.S. was not at home at the time. Terry was eventually awakened by a knock on the door. When he opened the door, he discovered his wife along with a man and a woman. Terry noticed his wife had an ice pack on her mouth, was cut on the inside of her upper lip, and was missing the top two buttons of her coat. His wife indicated to him someone had attempted to rape her. Terry stated he did not call the police that evening because he was too intoxicated.

The next morning, February 22, 1988, Terry translated a statement from his wife to the police. The statement K.S. gave to police on February 22, 1988, was that a man had passed her on the street, grabbed her, threw her in his car, and took her to a trailer. Terry stated he confronted his wife about that version of the story the next day, after being told by one of his friends that K.S. had not told the police the truth. After reassuring his wife he was not angry with her, K.S. went to the police and explained the change in her story.

Michelle Scogin testified about midnight on February 21, 1988, she was visiting Ken Peterson at the Woods Edge Trailer Park in Urbana. While she and Peterson were sitting in her car in front of his trailer, she noticed a white car pulling away from the trailer located across the street. Shortly after the car left, a woman came running across the street and knocked on their car window. Scogin stated the woman could not speak very well. After Scogin and Peterson gave a piece of paper to the woman, she wrote "need ride home." Scogin stated the woman was frantic, crying, had a swollen lip, and blood coming from her mouth.

Scogin and Peterson took the woman inside the trailer where K.S. wrote, "black man try rape and knife." Scogin stated she gave K.S. an ice pack for her mouth, and she and Peterson took K.S. home. Scogin testified she had not heard screaming coming from the trailer. She had volunteered to call the police but K.S. just wanted to be with her husband.

Ken Peterson testified he was living at No. 68 Peachtree in Woods Edge Trailer Park in February 1988. Peterson indicated he was familiar with the trailer at No. 74 Peachtree, located approximately 40 yards across the street. Peterson thought the individual who lived there had moved out before the beginning of February. At about midnight on February 21, 1988, Peterson was sitting in a car outside his trailer speaking to Michelle Scogin. Peterson stated that at some point, a white Cutlass pulled up to No. 74 Peachtree and a black man got out. Peterson stated the same man left in the car ap-

proximately 15 or 20 minutes later.

According to Peterson, a white woman came from the trailer at No. 74 Peachtree shortly after the black man drove away. The woman approached the car, in which he was sitting, making weird noises. After finding paper and pencil for her, the woman requested to be taken home. Peterson noted the woman was upset, crying, bleeding around the mouth, and generally looked beaten up. Peterson stated he and Scogin took the woman inside his trailer. Here, the woman wrote a note stating a black man had tried to rape her and he had a knife. Peterson stated he and Scogin drove the woman to her home, knocked on the door, and explained to her husband what had happened.

On the evening of February 22, 1988, Peterson gave a description of the vehicle he observed at No. 74 Peachtree to Detective Michael Cooper of the Urbana police department. He told Cooper the vehicle was a 1972 or 1973 white Cutlass. Peterson stated when the detective drove around the neighborhood where K.S. lived, he saw the same car which he observed in the trailer park the night before.

Frank Ford, Jr., testified that at some time during the week before Thanksgiving, 1987, he was sitting with defendant on Joe Puryear's porch in Urbana, when K.S. came out of the house next door and waved at Ford. Ford explained Puryear had earlier introduced K.S. and her husband to him. When defendant saw K.S. outside the house he made the statement "I'm going to get me some of that." Ford responded by telling defendant K.S. was married.

Clifford Walker testified while he was at Chips Thomas' house during the evening of February 21, 1988, a deaf girl by the name of K.S. came to see Chips. Walker indicated he, Chips, defendant, and K.S. sat around the kitchen table. They communicated with K.S. by writing on a notepad. It was during this time defendant made the statement, "He was going to get some of that pussy." Walker told defendant to leave K.S. alone because she was looking for her husband. Walker stated that at one point, defendant wrote a note offering to give K.S. a ride to find her husband. The four of them eventually left in defendant's car. Walker was dropped off at approximately 11 or 11:30 p.m. and did not see any of the other individuals that night.

Charles "Chips" Thomas testified he too recalled defendant's statement, "I'm going to get some of that pussy," made at Chips' kitchen table. Defendant repeatedly referred to K.S. as "the bitch," and told Thomas and Walker she could not understand what they were saying because she was "deaf and dumb." At one point, defend-

ant asked for a piece of paper and wrote a note to K.S. stating he would take her to look for her husband. After defendant wrote the note, they all left in his car to take Cliff home. After dropping Cliff off, defendant proceeded toward Thomas' girlfriend's house.

At some point prior to reaching his girlfriend's home, defendant made the statement "Chips, let's go get the pussy. The bitch can't talk, you know, and she can't tell nothing." Thomas responded by saying, "[B]ut she writes like hell, you know," and requested to be let out of the car. Thomas stated after he got out of the car, he could see K.S. trying to pull away from defendant as she sat in the front seat.

Michael Cooper testified he was an investigator with the Urbana police department and on Monday, February 22, 1988, he interviewed K.S. Cooper showed K.S. a photo lineup consisting of five photos, and K.S. identified defendant's photo as depicting the person who had assaulted her. Cooper also interviewed Ken Peterson during the evening of February 22, 1988. Peterson provided him with the note K.S. had written while at his trailer. Cooper drove Peterson past 802 E. Main to look at a car which he believed belonged to defendant. Cooper indicated once he got a little more than a block away from the address, he asked Peterson to start looking around. Cooper indicated Peterson subsequently identified a white Cutlass at the southwest corner of 802 E. Main as the car he had seen at the trailer park the night before. Cooper testified defendant was the driver of this car.

Cooper testified when he went to No. 74 Peachtree on February 23, 1988, it appeared no one was living there. Cooper and Investigator Michael Metzler entered through the front door of the trailer and conducted a search. When Cooper opened the front door, he immediately saw a button lying on the floor which appeared to match the buttons on K.S.'s coat. Cooper stated they found another similar button inside the trailer between the back and bottom cushion of the couch. While there were stains on the carpet and couch cushions, Cooper was unable to determine their nature or cause. Cooper arrested defendant on February 23, 1988.

On February 24, 1988, Investigator Cooper reinterviewed K.S. K.S. had come by the station while he was out working on the case. K.S. had told Investigator Metzler she had made some mistakes in her original report. Cooper reinterviewed K.S. in her apartment with Jenny Singleton present and acting as an interpreter.

Investigator Cooper searched defendant's car on February 24, 1988, for the knife allegedly used in the offense. Cooper stated he got the keys to defendant's car from defendant's fiancee, Lavon Aker. Cooper did not find a knife in the vehicle.

The defense presented the testimony of three persons who lived adjacent to No. 74 Peachtree in February 1988. All three persons testified they were home on Sunday evening, February 21, 1988. None of them heard or saw anything unusual.

Lavon Aker testified that approximately 11:10 p.m. on February 21, 1988, defendant, her fiance, told her Chips and K.S. wanted to look for Chips' car. Defendant came back at about 11:40 p.m. and stated K.S. wanted him to help her find Terry. Aker, defendant, their baby, and K.S. got into defendant's car, with K.S. sitting in the backseat. K.S. pointed the way to No. 74 Peachtree Drive and indicated she wanted to go inside the trailer.

Defendant walked with K.S. into the trailer, and they were inside for approximately two or three minutes. After exiting the trailer, defendant came to the car but K.S. stopped halfway between the trailer and the car and pointed to the ground as if she wanted to stay. Aker communicated to K.S. they could come back at a later time. K.S. responded by shaking her head no and pointing to the ground. At this time, Aker, defendant, and their baby went home.

Defendant did not testify.

■■ On appeal, defendant contends the trial court erred in admitting into evidence the statement made by K.S. to Ken Peterson and Michelle Scogin following the offense. The statement was written by K.S. and read, "the black man try rape and knife." Though defendant now raises this issue on appeal, defendant did not object to these statements at trial nor did defendant raise this issue in his post-trial motion. Failure to raise an issue at trial or in a post-trial motion, constitutes waiver. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Accordingly, we review this issue only to determine whether it constitutes plain error.

The trial court admitted this statement, noting it fell within the hearsay exceptions of a prompt complaint and a spontaneous declaration. On appeal, the State concedes the statement was not admissible as a prompt complaint since the testimony was not restricted to merely the fact the complaint was made. See *People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.

■ To bring a statement within the spontaneous declaration exception to the hearsay rule, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.) In determining whether a

statement is admissible as a spontaneous declaration, the trial court has considerable discretion. Its decision will not be reversed absent an abuse of that discretion. *People v. Washington* (1984), 127 Ill. App. 3d 365, 468 N.E.2d 1285.

The first and third required factors of the spontaneous declaration are clearly met in this case. K.S.'s statement, "the black man try rape and knife," clearly relates to the circumstances of the occurrence. Furthermore, such an occurrence would be sufficiently startling as to produce a spontaneous declaration.

■■ Regarding the remaining factor, absence of time to fabricate, time alone does not control the admissibility of the evidence, but rather the critical factor is the lack of opportunity to fabricate. (*People v. Sanchez* (1982), 105 Ill. App. 3d 488, 434 N.E.2d 395.) The trial court must look to the surrounding circumstances to determine whether there was an opportunity for reflection and invention. *People v. Chatman* (1982), 110 Ill. App. 3d 19, 441 N.E.2d 1292.

■■ K.S. did not have sufficient time or opportunity to fabricate. Peterson testified K.S. approached the car shortly after defendant drove away. Peterson and Scogin both testified the woman was upset, frantic, and crying. At their car, K.S. was able to communicate she wanted to be taken home by writing on a scrap of paper they found in the car. In an attempt to comfort K.S. and to better understand her, Scogin and Peterson took her inside the trailer where, in response to the question, "[W]hat's wrong?" she wrote, "black man try rape and knife." Peterson testified K.S. remained fairly upset during this entire time.

Under these circumstances, K.S.'s statement qualifies as a spontaneous utterance and was properly admitted into evidence. Though the statement was made inside the trailer, it still occurred within moments of K.S.'s first contact with another individual. Moreover, in this instance, consideration must be given to K.S.'s inability to communicate and the necessity to write such a message. The fact the statement was made in response to the question, "What's wrong?" does not disqualify this statement as a spontaneous declaration. Though one of the circumstances to be taken into account is whether the statement was made voluntarily or in response to a question, it is well established that asking the declarant such a question is insufficient to destroy the spontaneity of a response. *Damen*, 28 Ill. 2d at 472, 193 N.E.2d at 30; *Sanchez*, 105 Ill. App. 3d at 491, 434 N.E.2d at 398.

Defendant further contends the trial court erred in admitting the testimony of Frank Ford concerning the statement of defendant made three months prior to the offense. This statement, made upon viewing

K.S., was, "I'm going to get me some of that." Defendant contends this evidence is irrelevant and its introduction only served to prejudice him.

■ Threats made by an accused against the victim prior to the commission of the criminal act are admissible in evidence as showing malice and criminal intent. (*People v. Lion* (1957), 10 Ill. 2d 208, 139 N.E.2d 757.) Considerations such as the circumstances under which the alleged threats were made, their repetition, and the lapse of time between them and the offense affect only the probative force or weight of such evidence, but not its admissibility. *People v. Jayne* (1977), 52 Ill. App. 3d 990, 368 N.E.2d 422.

■ Here, the probative value of defendant's statement, made three months prior to the offense, was significant. Taken in its context, the statement showed defendant's desire and intent to have a sexual relationship with K.S. Such a statement is clearly relevant to defendant's criminal intent. Accordingly, the trial court did not err in admitting this statement.

■ Defendant contends the trial court erred in refusing to instruct the jury on the lesser offenses of attempt (aggravated criminal sexual abuse) (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 12—16(a)(1)), aggravated battery (Ill. Rev. Stat. 1987, ch. 38, par. 12—(4)(b)(1)), and attempt (criminal sexual assault) (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 12—13(a)(1)). Defendant alleges these offenses are included offenses of attempt (aggravated criminal sexual assault). (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 12—14.) "Included offense" is defined in section 2—9(a) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1987, ch. 38, par. 2—9(a)), which states:

" 'Included offense' means an offense which
(a) Is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged * * *."

■ It is undisputed defendant is entitled to an instruction on an included offense when the evidence would permit the jury to rationally find him guilty of the lesser offense and acquit him on the greater. (*People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413, citing *Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.) However, the lesser offense cannot be completely encompassed within the greater. (*Sansone v. United States* (1965), 380 U.S. 343, 13 L. Ed. 2d 882, 85 S. Ct. 1004.) An instruction on an included offense is also not required where the evidence clearly shows defendant is either guilty of the greater offense

or not guilty of any offense. *People v. Thompson* (1976), 35 Ill. App. 3d 773, 342 N.E.2d 445.

 Here, the trial court did not err in refusing to instruct the jury on these additional offenses. An examination of all the evidence indicates the jury could have reached but two possible conclusions: the defendant was guilty of attempt (aggravated criminal sexual assault), or was guilty of none of these crimes.

The distinction between attempt (aggravated criminal sexual assault) and attempt (aggravated criminal sexual abuse) is the requirement defendant intends to commit an act of sexual penetration and not mere sexual conduct. From the evidence, defendant was unquestionably guilty of attempt (aggravated criminal sexual assault). K.S. testified defendant stated, "I will rape you," after pushing her to the floor of the trailer and forcefully opening her coat. Immediately prior to the offense and while K.S. was in the car with them, defendant stated to Chips Walker, "Chips, let's go get the pussy. The bitch can't talk, you know, and she can't tell nothing." Defendant made a similar statement in K.S.'s presence at Thomas' home earlier that same evening. Three months prior to the offense, defendant stated to Frank Ford, while in K.S.'s presence, that he was going to "get some of that." There was no evidence in the record showing defendant only intended to commit an act of sexual conduct.

The distinction between the offenses of attempt (aggravated criminal sexual assault) and attempt (criminal sexual assault) is the use of a knife. Again, from the evidence defendant was unquestionably guilty of attempt (aggravated criminal sexual assault). K.S. testified defendant held a knife to her while holding her down. She further testified he cut the inside of her mouth with the knife causing her to bleed. This testimony was substantiated by Peterson and Scogin, who saw K.S. immediately after the offense. They testified her lip was cut and bleeding. There was no contrary testimony presented. Accordingly, the trial court appropriately instructed the jury on the sole offense of attempt (criminal sexual assault).

Battery is generally not an included offense of attempt (aggravated criminal sexual assault). The offense of battery requires bodily harm or physical contact, which is not a required element of attempt (aggravated criminal sexual assault). See *People v. Traufler* (1987), 152 Ill. App. 3d 987, 505 N.E.2d 21.

However, the indictment in this case alleged defendant "with the intent to commit the offense of Aggravated Criminal Sexual Assault, *** performed a substantial step toward the commission of that offense, in that he while displaying a dangerous weapon, namely: a

knife, knowingly attempted to rip the clothes off of ***, with the intent, by the use of force, to place his penis in the vagina of." While the jury instructions did not contain this language, the portion of the indictment alleging defendant, while displaying a dangerous weapon, knowingly attempted to rip the clothes off of K.S. could constitute aggravated battery when taken by itself.

In support of his argument that the jury should have been instructed on the included offense of aggravated battery, defendant cites *People v. Dace* (1984), 104 Ill. 2d 96, 470 N.E.2d 993. In *Dace*, the Illinois Supreme Court held the defendants were entitled to the instruction on the included offense. Specifically, the court stated, "We hold that under these circumstances, where the information charged the specific intent to commit theft and the offense of theft was proved by the evidence, refusal to give defendant's tendered instructions was error." (*Dace*, 104 Ill. 2d at 103, 470 N.E.2d at 996.) However, under the circumstances of *Dace*, the evidence adduced at trial supported a conviction for the lesser offense. *Dace*, 104 Ill. 2d at 103, 470 N.E.2d at 996.

The same does not hold true for the case at bar. Here, the evidence adduced at trial does not support a conviction for only the lesser offense. Clearly, from all the evidence defendant's intent was that of sexual penetration. The acts which he took were steps toward that ultimate goal. No rational trier of fact could have convicted defendant only of aggravated battery. Where the result of the trial would not have been different if the lesser instruction had been given, a refusal to give the lesser instruction is harmless and not a ground for reversal. (*People v. Moore* (1983), 95 Ill. 2d 404, 447 N.E.2d 1327.) Accordingly, any possible error in failing to give the instruction for aggravated battery is not grounds for reversal.

Defendant contends he was deprived of a fair trial when the prosecutor, in the course of closing argument, improperly summarized evidence. Specifically, defendant contends the prosecutor's comments, stating (1) Ken Peterson saw a black man walk into the trailer shortly before the alleged offense, (2) K.S. looked toward Chips when defendant offered a ride to her, and (3) defendant's fiancee probably had the knife used in the offense, improperly summarized the evidence and prejudiced defendant. Defendant further states the prosecutor improperly shifted the burden of proof when arguing there was no evidence to contradict K.S.'s testimony concerning the use of a knife in the offense. We disagree.

■ Initially we note, defendant failed to object to these statements at trial or in a post-trial motion. Failure to do so constitutes

waiver. (*Enoch*, 122 Ill. 2d at 186-87, 522 N.E.2d at 1129-30.) Accordingly, our review of this issue is limited to only whether they constitute plain error.

■■■ ■ Prosecutors are allowed great latitude in closing arguments. To determine whether error exists, each case must be decided on its own facts. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) Arguments and statements based upon facts and evidence or upon legitimate inferences from such evidence are not outside the bounds of proper argument (*People v. Oliger* (1975), 32 Ill. App. 3d 889, 336 N.E.2d 769), and the prosecution can respond to comments by defense counsel which invite or provoke response. (*People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) The substance and style of closing arguments are within the discretion of the trial court, and its finding will not be disturbed absent extreme error. *People v. Maldonado* (1981), 101 Ill. App. 3d 948, 428 N.E.2d 1087.

The prosecutor's statements in closing argument regarding the evidence or assumptions which could be drawn from the evidence do not constitute plain error. At trial, Peterson's testimony was he saw a black man exit a white Cutlass upon arrival at the trailer and, "15 or 20 minutes after it got there," he saw the same man leave the trailer in the same white Cutlass. Chips Thomas' testimony regarding whether K.S. looked toward him when defendant offered her a ride was that they were all sitting at the kitchen table. K.S. was more or less communicating with him at this time as she was turned sideways in the chair.

It was during the State's rebuttal that the prosecutor stated defendant's fiancee, Lavon Aker, probably had the knife used in the offense. This argument was invited by defense counsel, as defense counsel made numerous references to the unknown whereabouts of the knife. During closing argument, defense counsel stated:

"Where's the knife, the knife that we can't find, and the knife that [K.S.] can't [lose]. Why can't she [lose] the knife? She needs it. She has already told the police about it. She needs it. She has told Terry that all this was against her will, she was forced, and she didn't know the individual. She can't [lose] the knife. It's her only link with the truth. Yet, it's a lie."

The comments complained of by defendant are comments made in direct response to defense counsel's closing argument. Moreover, these remarks represented a reasonable inference from the evidence presented. During cross-examination, Aker admitted to having lied under oath on a prior occasion to protect defendant from going to jail.

We also find no merit to defendant's allegations the prosecutor

improperly shifted the burden of proof during rebuttal when the prosecutor stated, "Well, what evidence is contradicting K.S. saying there's a knife?" Again, the prosecution was responding to the defense counsel's statements regarding the absence of the knife.

Although the prosecutor must take great care not to prejudice the jury, he may express opinions. Specifically, the prosecutor has the right to comment on the credibility of the witnesses. (*People v. Walsh* (1980), 80 Ill. App. 3d 754, 400 N.E.2d 587.) Additionally, it is permissible for a prosecutor to comment on the uncontradicted nature of the State's case, even where the only person who could have contradicted the State's evidence was the defendant himself. *People v. Mills* (1968), 40 Ill. 2d 4, 237 N.E.2d 697.

It is apparent the prosecutor's comments were not the equivalent of an improper comment on the defendant's failure to testify or an improper shifting of the burden of proof. The prosecutor's statement K.S.'s testimony was uncontradicted is not a reference to defendant's failure to testify, but rather to the strength of the State's case. As such, no error occurred.

Last, defendant contends he was not proved guilty beyond a reasonable doubt as K.S.'s testimony concerning the offense was neither clear and convincing nor substantially corroborated. In making this allegation, defendant cites the longstanding rule that in cases involving sexual offenses, the testimony of the complaining witness must be clear and convincing or must be substantially corroborated to support a conviction. *People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *People v. Server* (1986), 148 Ill. App. 3d 888, 499 N.E.2d 1019, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.

██ █ We will no longer require that in a case in which a sex offense is charged, the State must demonstrate either the victim's testimony is clear and convincing or substantially corroborated to prove guilt beyond a reasonable doubt. (See *People v. Roy* (1990), 201 Ill. App. 3d 166, 184-85, 558 N.E.2d 1208, 1221; *People v. Cole* (1990), 193 Ill. App. 3d 990, 997-1001, 550 N.E.2d 723, 728-31 (Steigmann, J., specially concurring).) Such a standard is contrary to recent Illinois Supreme Court decisions which disapprove of particularized definitions of reasonable doubt. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344; *People v. Crow* (1985), 108 Ill. 2d 520, 485 N.E.2d 381.) Moreover, there is no legitimate reason to place additional requirements on the victims of sex crimes regarding how persuasive their testimony must be merely because of the nature of the crime. The testimony of no other category of crime victim is held to be automatically suspect or to require additional proof beyond the statutory re-

quirements. The standard cited in *Secret* and *Server* is based upon sexist concepts which have no meaning.

Instead, we review the issue of whether defendant was proved guilty beyond a reasonable doubt pursuant to the same standard applied in any other criminal case. The standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Based on the evidence in this case, the jury's verdict must be affirmed.

Affirmed.

GREEN, J., concurs.

JUSTICE LUND, specially concurring:

Both of my esteemed companions on the panel of this case have now rejected the clear and convincing, or substantially corroborated, test. I express no criticism of the majority's view on the clear and convincing issue. My examination of the evidence in this case.leads to the conclusion that substantial corroboration was present. The spontaneous declaration and the defendant's statement to another of his intentions easily provided this evidence.