THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WAYNE McDADE, Defendant-Appellant.

Fourth District   No. 4—91—0111

Opinion filed September 30, 1991.

Stephen R. Frank, of Johnson, Frank, Frederick & Walsh, of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant, Wayne McDade, was convicted of two counts of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13) following a jury trial in Champaign, Illinois. Defendant was sentenced to two 7-year terms of imprisonment to run consecutively. Defendant takes a direct appeal from his conviction and sentence, asserting the evidence was not sufficient to prove him guilty beyond a reasonable doubt of vaginal and anal penetration by force, the trial court erred in allowing the victim's sister to testify regarding statements made by the victim to her, consecutive terms of imprisonment were not proper, and the trial court abused its discretion in sentencing him to two consecutive seven-year terms. We affirm.

Count I of the indictment alleged defendant committed an act of sexual penetration by the use of force in that he inserted his penis

into the vagina of the victim. Count II alleged defendant committed an act of sexual penetration by the use of force in that he inserted his penis into the anus of the victim. Defendant admitted to having sexual intercourse with the victim but asserted the defense of consent.

On August 10, 1990, the victim went with her friend, D.F., to the Silver Bullet in Urbana, Illinois. The victim testified they sat at the bar listening to the band and eventually began a conversation with three men seated at a table in front of them. Defendant was one of these three men to whom the victim began speaking. The victim testified she was drinking beer that night although she could not recall how much she consumed. Defendant was also drinking beer. The victim testified the men wore matching softball uniforms and defendant told her his name was Wayne. Defendant did not state his last name. The victim, D.F., defendant, and his two friends danced until approximately 1:15 a.m. when the bar closed. At that time, the victim, defendant, and another man, Tim Kimmer, decided to go have breakfast at the local Steak 'N Shake restaurant. D.F. did not go to breakfast with the other three people. The victim testified she rode with defendant to the restaurant while Tim drove his own car. Steak 'N Shake was not serving breakfast at that time, so they drove to Taffies, which is located in Champaign. Defendant and the victim did not eat, but drank coffee while Tim ate breakfast. The victim and defendant got back into his car and the victim testified she believed defendant was going to take her home.

Defendant drove in the general direction of the victim's home, but then turned onto a country road north of the interstate highway. The victim testified she asked defendant where he was going and he allegedly told her he knew a shortcut to her house. Defendant eventually stopped the car to relieve himself. The victim testified defendant approached the car on the passenger side after urinating and said to her that she was used to having things "her way" and now he was going to have it "his way." The victim testified she got out of the car and told defendant she had to go to the bathroom. Defendant told her not to leave when she got out of the car. She got out of the car and defendant stood right next to her as she attempted to urinate. Thereafter, the victim got back into the car because defendant told her he was only joking and was going to take her home.

The victim testified defendant then told her that she needed to cooperate with him and then he pinned her arms and legs behind her back. Defendant had already pulled up her clothing when they were standing outside the car. At this point, the victim was lying on the front seat of the car and still had her clothes on. Eventually, all of her

clothing was removed by defendant. The victim testified defendant threatened to break her arms and legs if she did not cooperate. Defendant also indicated he knew karate. The victim testified defendant grabbed her throat with one hand, with his thumb on one side of her neck and his four fingers on the other side. She further testified defendant stated if she did not cooperate, he would take her to his friends, who would also have sexual intercourse with her and hurt her worse than he would. The victim testified defendant then forced her to have vaginal intercourse. She testified defendant next attempted to have her perform oral sex but was unsuccessful because she refused to remove her hand from her mouth. Finally, the victim testified defendant then rolled her over onto her stomach and had forced anal intercourse. The victim was unsure whether defendant ejaculated.

Thereafter, the victim testified that on the way back into town, defendant said the next time they would see each other would be in court. She stated she was crying and he told her to get dressed while they drove back into town. Defendant allegedly told the victim he was sorry and that this happens when he drinks. The victim testified he had given her a business card earlier in the evening and on the way home demanded to have it returned to him.

Defendant dropped the victim off approximately 1½ blocks from her apartment. The victim testified she ran home, woke up her sister, and immediately told her what had happened. Her sister phoned the police, who came to the house. The victim gave them a description of defendant's car and the address where she believed he had said he lived. The victim was taken to Carle Clinic in Champaign, where she was examined.

The following day, the victim accompanied a deputy to a trailer park where the defendant was believed to reside. She identified a car that appeared to look like the one in which the attack occurred. This car was later determined to belong to defendant. Approximately five days later, the victim identified defendant in a lineup. Finally, the victim testified her entire body was sore after the incident and that she initially fought defendant but stopped because he threatened to hurt her.

The second witness to testify was the victim's sister, C.C., who testified she heard her sister walk into the house on the morning of August 11, 1990. C.C. testified her sister was making a noise but she could not tell at first whether the victim was laughing or crying. She testified the victim entered the bedroom and woke her up. The victim was hysterical, shaking, crying, and very hard to understand. C.C. asked what happened and the victim stated she was raped. C.C. got

out of bed and asked her sister to tell her what happened. Over objection by defense counsel, C.C. related the following:

"She told me that her and a friend of hers, [D.F.], had been at The Silver Bullet and there was some guys there that had been talking to them, and I am not for sure for how long a period of time or anything, and after the bar closed they decided they were going to go out for breakfast. They were going to go to Steak-N-Shake, for whatever reason Steak-N-Shake was either closed or not serving breakfast at this time, and they were going to go to Taffies and then once they got to Taffies I think they just had coffee or something, which they weren't serving breakfast anymore, and then [the victim] wanted to go home but she was not drove home, she was drove out in the country somewhere and she told me that a person driving the car had stopped, told her that he had to go to the bathroom, then got back in the car and told her that they were going to have sex, that she—he knew karate and if she didn't do what he said he would break her arms, and then she told me that she had been raped. Then I got up out of bed, and I went and called 911.

\* \* \*

\*\*\* She told me his name was Wayne and she thought it was McCracken 'cause she had—he had given her this business card when they were at The Silver Bullet and then had—she couldn't remember the exact name for sure but he had taken it back from her after he raped her. He—he had told her that he wanted it back, and she tried to act like she didn't know what he was talking about."

C.C. testified the victim's shorts were not fastened properly, her hair was a mess and her makeup was running because she had been crying and also because it had been smudged. She testified her sister had red marks on one side of her neck that looked like a finger where somebody had grabbed her neck. Finally, C.C. testified she went with her sister to the hospital and it took her sister anywhere from 24 to 36 hours to sleep and calm down.

The victim's friend, D.F., testified in a manner essentially consistent with the victim's testimony. D.F. stated she and the victim were drinking beer that night but neither was drunk and both knew what they were doing. She testified that after the bar closed, D.F., the victim, and two other men discussed going to breakfast. D.F. decided not to go with them because she was house-sitting. D.F. testified the victim was not drunk when she left the bar and she felt the victim would be all right with the men.

Champaign County deputy sheriff Mark D. Goodwin testified he responded to a criminal sexual assault complaint on August 11, 1990. Deputy Goodwin went to the victim's house and spoke with her and her sister. He described the victim as sitting at the kitchen table with her clothing in disarray, her shorts unbuttoned, and quite upset, crying, and very emotional. Deputy Goodwin testified the victim told him she was raped and then he offered her a ride to the hospital. Finally, Deputy Goodwin testified he collected evidence from the nurse at the hospital which was forwarded to the Illinois Bureau of Forensic Science for analysis.

Dr. Jens Yambert testified he examined the victim in the emergency room of the Carle Clinic on August 11, 1990. Dr. Yambert testified the victim was not very communicative, seemed to be scared, and did not respond verbally to questions. He examined the victim's body and genital area and noticed some irritation and reddening near the opening of the vagina. Dr. Yambert testified he noticed white debris near the opening of the vagina and the anus which he believed to be recently deposited semen. He also noticed some other debris that appeared to be body hair. Dr. Yambert testified he performed a speculum exam on the victim but could not use large speculum because the victim was apprehensive, scared, and was experiencing tenderness in the vaginal area. Dr. Yambert did not notice any unusual welts or contusions on the victim's body, but did note that the victim stated her attacker held her throat and pulled her arms and legs behind her. Dr. Yambert did acknowledge the victim later called the clinic complaining of pain in the left shoulder and wrist from this incident.

Dr. Yambert testified, based on a reasonable degree of medical certainty, that the cause of the reddening in the victim's vagina was either intercourse or attempted intercourse. He also testified that this type of irritation or reddening would be consistent with forced sexual penetration.

On cross-examination, Dr. Yambert admitted the victim had no scrapes, contusions, or abrasions on her body. He also admitted there was no tearing in the vaginal area or in the anal area. Dr. Yambert testified he could not determine whether there had been actual penetration. He testified there were many possibilities as to what could cause irritation in the vaginal area but that, in his opinion, the degree of reddening of the victim's vaginal area would be consistent with vigorous intercourse, forced intercourse, or attempted intercourse.

Sergeant Bob Doty testified that in the early morning hours of August 11, 1990, he took the victim to the Columbia Village mobile home trailer park to see if she could spot the vehicle in which the at-

tack took place. Sergeant Doty told the victim that just because he was taking her through this particular mobile home park, this did not mean the car was definitely there. Sergeant Doty stated that, although he knew where the car was located, he did not immediately go there but drove around the block, had the victim's sister wait in her car near the park office and then drove randomly throughout the trailer park. Eventually, Sergeant Doty drove by the residence where the vehicle was located and the victim stated that it was the vehicle in which the attack took place.

Sergeant Doty then took the victim back to the park office and returned to the residence where the vehicle was located. Sergeant Doty testified that he knocked on the door and shortly thereafter a man, identified by Doty in court as defendant, answered the door. Sergeant Doty identified himself to the defendant and stated he wished to speak to him but told defendant he was not under arrest. The defendant asked Sergeant Doty what he wanted to speak to him about and Sergeant Doty stated he wished to speak about an incident that happened the previous evening. Defendant stated the only thing that had happened the previous evening was that he had met a " 'dingee' girl" at the Silver Bullet in Urbana.

Defendant further revealed to Sergeant Doty that he had gone to the Silver Bullet after a softball game with some team members and had met a girl; she approached him. Defendant stated he left with this girl, drove to the Steak 'N Shake restaurant, then drove to Taffies to eat breakfast and then dropped the girl off near her home near Crystal Lake Park. Sergeant Doty asked defendant if it was possible he had taken a different route after leaving Taffies than what he told Sergeant Doty and defendant replied, "No." Sergeant Doty testified he asked defendant whether he had sexual intercourse with this woman and defendant replied he had not.

Deputy Steven Zook of the Champaign County sheriff's department testified that on August 11, 1990, he watched a vehicle parked outside a mobile home that had been previously identified by Sergeant Doty. At approximately 3 p.m., or shortly thereafter, Zook saw a man, identified in court as defendant, approach the vehicle. Zook then himself approached the vehicle, took custody of it and arrested defendant. Defendant was informed of the reason for his arrest and that his car was being impounded pursuant to a search warrant. Zook testified the defendant made the following three statements: (1) "She wanted it"; (2) "She was laying [sic] all over me"; and (3) "There were a lot of people that seen it." Zook testified he did not ask defendant any questions at this time. On cross-examination, Deputy Zook admitted

defendant also made these statements at the time of his arrest: "I didn't force her. She went with me on her own."

The final witness for the State was Phillip Sallee, a forensic serologist for the Illinois State Police at the Springfield crime lab. Sallee testified he received a quantity of evidence from the Champaign County sheriff's department on September 14, 1990. Sallee examined this evidence and made the following conclusions: (1) the vaginal swabs taken by Dr. Yambert indicated the presence of semen; (2) the rectal swabs taken by Dr. Yambert indicated the presence of semen; (3) the defendant could not be excluded as a possible source of the semen found on the vaginal swabs; (4) the semen on the rectal swabs could have come from defendant; and (5) that due to the amount of semen present on the rectal swab, it was more than likely that there was penetration or contact with the rectum as opposed to drainage from the vagina. On cross-examination, Sallee testified there were other factors, such as the length of time between the assault and the collection of samples and whether the victim engaged in any type of hygiene activity, that would affect a reading of the vaginal and rectal swabs.

Defendant testified he lived at 2046 Constitution in Urbana, Illinois, was married, and had two children. Defendant testified that on August 10, 1990, he went to a softball game and then went to the Silver Bullet with some teammates. There he met the victim after she approached his table. Defendant testified he danced with the victim and his friend danced with her friend. When the bar closed at approximately 1 a.m., the victim, Tim, and defendant decided to go to Steak 'N Shake for breakfast. Defendant testified the victim said, "I think I will go home with you." Defendant testified the victim rode in his car and sat in the middle of the front seat and that Tim followed them in his own car. They did not stay at Steak 'N Shake because breakfast was not being served and they decided to go to Taffies instead. They arrived at Taffies around 2 a.m. and he did not eat, but drank two cups of coffee. Defendant stated the victim sat next to him in the booth and that she was rubbing her leg up against him.

Defendant testified they left approximately at 2:30 or 2:45 a.m., and that his friend Tim gave him the four cans of beer left from the six pack purchased as they left the Silver Bullet. Defendant stated he began driving in a route through the country rather than through town to avoid the police. Defendant eventually stopped his car because he had to urinate. He testified he left the car keys in the ignition. Defendant stated he and the victim talked for a while and she eventually said she had to go to the bathroom. Defendant testified the

victim got out of the car while he waited in the driver's seat. The victim returned to the car, saying she did not have to go to the bathroom, and they talked a little bit more. Defendant stated he got out of the car because he had to urinate again. After he relieved himself, he got back in the car on the passenger side. Defendant testified the foreplay indicated to him the victim's willingness to have sexual intercourse. Defendant stated the victim moved over to the middle of the car to let him in on the passenger side. He eventually took off the victim's clothes, but she did not really help him with this because there was not much room in the car. Defendant testified the victim did not offer any resistance to him undressing her. Defendant testified that after the victim's clothes were off, she lay down on her back and they had vaginal intercourse. Defendant testified they eventually changed positions because his arms and legs were getting sore due to the limited amount of space in the car. Defendant stated this new position was also becoming cramped and awkward so they returned to the original position. Defendant stated the victim never asked him to stop nor offered any resistance or attempted to get away from him.

Defendant testified the victim eventually told him to stop and, approximately one minute after that, he did. He testified he put his clothes on and the victim began getting dressed. Defendant stated at that time the victim was very quiet. He denied telling the victim he would break her arms and legs if she did not have sex, that his friends would hurt her, or that he knew karate. Defendant stated that he drove the victim home, and she was not crying but acted as if she felt guilty. Defendant stated he took the back way home to avoid confrontation with the police because of problems with his truck. Defendant stated he asked for the return of the business card he had given the victim because he never intended for her to keep it. Finally, defendant stated he told a different story to Sergeant Doty when first confronted about this incident because he had just awakened and explained things to his wife. He was not proud of the fact that he had slept with another woman while he was married. Defendant stated he never thought the victim did not want to have sex with him and never forced her to have sex.

On cross-examination, defendant testified the victim raised up and allowed him to pull off her shorts. Defendant testified he did not attempt to penetrate her anus when they changed positions but rather was only attempting to have vaginal sex from a different position. Defendant further testified he was not aware he was in her anus area.

The jury returned guilty verdicts on both counts. On January 25, 1991, the trial court denied defendant's motion for judgment *n.o.v.* and his motion to declare section 5—5—3(c)(2)(H) of the Unified Code of Corrections (Corrections Code) unconstitutional. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3(c)(2)(H).) The trial court stated section 5—8—4(a) of the Corrections Code (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a)) required the imposition of consecutive sentences. The court found that, because of the particular facts and circumstances of the case, the prolonged and brutal nature of the assault and the defendant's past conviction for battery, more than a minimum sentence was necessary. Accordingly, the court sentenced defendant to two 7-year terms of imprisonment to run consecutively. This appeal followed.

Defendant contends the evidence was insufficient to prove he forced the victim to have vaginal intercourse. Defendant further contends the evidence was insufficient to prove anal penetration occurred and, assuming anal penetration did occur, the evidence was insufficient to prove forced anal penetration. The State contends the evidence was sufficient to prove guilt beyond a reasonable doubt for both counts of the indictment.

We no longer apply a different standard of review in a case in which a sex offense is charged, *i.e.*, that the victim's testimony be clear and convincing or substantially corroborated to prove guilt beyond a reasonable doubt. The proper standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277; *People v. James* (1990), 200 Ill. App. 3d 380, 558 N.E.2d 732.) The resolution of factual disputes and the assessment of the credibility of witnesses are for the trier of fact. The reviewing court will not reverse a conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to defendant's guilt remains. *People v. Roy* (1990), 201 Ill. App. 3d 166, 558 N.E.2d 1208.

■ The jury had sufficient evidence to find defendant guilty beyond a reasonable doubt on both counts of criminal sexual assault. First, the victim explicitly testified she did not consent to either vaginal or anal intercourse. The victim testified defendant threatened to hurt her if she did not cooperate. Moreover, the victim, immediately upon returning home, told her sister she was raped. The medical evidence established irritation and reddening in the vaginal area, which Dr. Yambert testified would be consistent with forced intercourse. The

medical evidence also established the victim experienced pain in her left arm and sought medication for that pain, which is consistent with her statement that defendant pinned her arm behind her. The medical evidence established the presence of semen near the anus and the rectal swabs from that area indicated the defendant could have been a source of the semen. Finally, the jury had an opportunity to listen to extensive cross-examination of the victim as well as the other witnesses for the State. The jury had the opportunity to listen to defendant's version of what happened. We conclude the evidence was sufficient to support defendant's conviction.

Defendant next contends the testimony of the victim's sister regarding the victim's statement describing the details of her alleged attack was erroneously allowed into evidence over his objection because it did not meet the requirements of the spontaneous declaration exception to the hearsay rule. The State responds the statement was properly admitted as a spontaneous declaration.

Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within an exception. (*People v. Lawler* (1991), 142 Ill. 2d 548, 568 N.E.2d 895.) To bring a statement within the spontaneous declaration exception, three factors are necessary: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) an absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (*Roy*, 201 Ill. App. 3d at 180, 558 N.E.2d at 1218.) In determining whether a statement is admissible as a spontaneous declaration, the trial court has considerable discretion. Its decision will not be reversed absent an abuse of that discretion. *James*, 200 Ill. App. 3d at 388-89, 558 N.E.2d at 738.

The first and third required factors are present in this case. Clearly, the victim's statement to her sister that she was raped and the details of the attack relate to the circumstances of the occurrence. Moreover, the attack itself is a sufficiently startling event to produce a spontaneous declaration. (See *Roy*, 201 Ill. App. 3d at 181, 588 N.E.2d at 1218; *James*, 200 Ill. App. 3d at 389, 558 N.E.2d at 738.) The only remaining factor is whether there was time for the victim to fabricate her story.

Time alone does not control the admissibility of the evidence, but rather the critical factor is the lack of opportunity to fabricate. The trial court must look to the surrounding circumstances to determine whether there was an opportunity for reflection and invention. (*James*, 200 Ill. App. 3d at 389, 558 N.E.2d at 738.) Questioning of the declarant by a third party may destroy spontaneity, but a simple

question such as "what happened" will not. *Lawler*, 142 Ill. 2d at 560, 568 N.E.2d at 900.

The evidence suggests the victim did not have sufficient time or opportunity to fabricate. Defendant testified they left Taffies at 2:45 a.m. The victim testified it took approximately 5 or 10 minutes for defendant to drive from where the attack occurred to her neighborhood and that she arrived home between 4:15 and 4:30 a.m. Deputy Goodwin testified he responded to a complaint by the victim's sister at 4:25 a.m. The victim testified she ran the 1½ blocks from where defendant dropped her off to her house and, upon entering the apartment, immediately awakened her sister and made the statements regarding the attack.

The maximum time the victim would have had to fabricate a story would be the total time of the car ride to her neighborhood plus the time it took her to run 1½ blocks. The victim, her sister, and Deputy Goodwin all testified the victim was very upset and distraught at the situation. Moreover, the victim told her story to the first person she saw after the attack. The fact that she told her sister what had happened in response to a question by her sister does not destroy the spontaneity of the statement. Given the nature of the attack, the lack of time or opportunity to fabricate, and the fact that the victim immediately told the first person she encountered what had happened, the trial court did not abuse its discretion in allowing the testimony.

For his third argument, defendant contends the trial court erred in imposing consecutive sentences for his convictions because each conviction was based on a violation of the same statute. He urges this court to reconsider its rulings in *People v. Lafferty* (1990), 207 Ill. App. 3d 136, 565 N.E.2d 279, and *People v. Ewald* (1991), 210 Ill. App. 3d 7, 568 N.E.2d 451, wherein this court upheld mandatory consecutive sentences for sex offenses arising from the same course of conduct. Defendant suggests the legislature did not intend to require consecutive sentences for multiple violations of the same statute. Defendant's position is without merit.

In *Lafferty*, the defendant was convicted of two counts of aggravated criminal sexual assault. Defendant there committed two acts of sexual penetration by placing his finger in the anus of his victim and his penis in the anus of the victim. Defendant was sentenced to consecutive terms of imprisonment and, on appeal, contended the trial court was not *required* to impose consecutive sentences.

This court initially noted that section 5—8—4(a) of the Corrections Code provides for consecutive sentences where defendants are convicted of multiple violations of section 12—13 or 12—14 of the Crimi-

nal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, pars. 12–13, 12–14). (Ill. Rev. Stat. 1989, ch. 38, par. 1005–8–4(a).) This section was amended in July 1988 to provide that when a defendant is convicted of a violation of section 12–13 or 12–14 of the Code, the court *shall* enter sentences to run consecutively. (Pub. Act 85–1030 §3, eff. July 1, 1988 (1988 Ill. Laws 200, 204).) This court concluded consecutive sentences were mandatory under this section. "The amendment to the statute *** constitutes a more recent expression of legislative intent and establishes a new rule." *Lafferty*, 207 Ill. App. 3d at 137, 565 N.E.2d at 280.

Defendant suggests that because the definition of "[s]exual penetration" is so broad ("any contact, however slight") (Ill. Rev. Stat. 1989, ch. 38, par. 12–12(f)), if force could be proved, a defendant could be convicted of numerous violations of section 12–13 each time there was a withdrawal and reentry. He contends the legislature could not have intended such a result.

Defendant's argument fails to present a persuasive basis for departing from the decision in *Lafferty*. The facts in *Lafferty* are analogous to those here. In each case, the defendant was convicted of two violations of the same section of the Code. The legislature, through the amendment to the sentencing statute, expressed its intent to have mandatory consecutive sentences for a violation of section 12–13 or 12–14. Defendant was convicted of two violations of section 12–13 and, therefore, consecutive sentences were required.

■ In the alternative, defendant asserts the imposition of consecutive sentences for multiple violations of the same section of the Code violates his double jeopardy rights. Defendant contends he was convicted of two acts of penetration during one rape. The State contends defendant was convicted of two separate acts of criminal sexual assault and, thus, consecutive sentences do not violate his double jeopardy rights.

The fifth amendment to the United States Constitution (U.S. Const., amend. V), made applicable to the States through the fourteenth amendment (U.S. Const., amend. XIV), provides: "No person *** shall *** be subject for the same offence to be twice put in jeopardy of life or limb ***." This constitutional doctrine protects a defendant from three situations: it protects against a second prosecution for the same offense after acquittal; it protects against a second prosecution for the same offense after conviction; and it protects against multiple punishments for the same offense. (*People v. Flanagan* (1990), 201 Ill. App. 3d 1071, 559 N.E.2d 1105.) Where the same act or transaction constitutes a violation of two distinct statutory pro-

visions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not. (*Blockburger v. United States* (1932), 284 U.S. 299, 304, 76 L. Ed. 306, 309, 52 S. Ct. 180, 182.) If each offense requires proof of an additional fact not required to prove the other, then the two offenses are not the same for double jeopardy purposes. (*People v. Totten* (1987), 118 Ill. 2d 124, 138, 514 N.E.2d 959, 965.) The test is to focus on the statutory elements of the charged offenses, rather than on the actual evidence presented at trial. *Flanagan*, 201 Ill. App. 3d at 1077, 559 N.E.2d at 1109.

Where defendant commits more than one criminal act in a single episode or transaction, the State may prosecute for more than one offense unless the charges involve precisely the same physical act. (*People v. Segara* (1988), 126 Ill. 2d 70, 533 N.E.2d 802.) "[W]here the physical acts are distinct, the defendant can be convicted of more than one offense ***." *People v. Foley* (1990), 206 Ill. App. 3d 709, 717, 565 N.E.2d 39, 44-45.

Section 12—13 of the Code provides an accused commits criminal sexual assault if he commits an act of sexual penetration by the use of force or threat of force. Count I of the indictment alleged defendant inserted his penis into the vagina of the victim, and count II of the indictment alleged defendant inserted his penis into the anus of the victim. Clearly, these are two separate acts of sexual penetration. The victim testified defendant forced her to have vaginal intercourse and forced her to roll over and have anal intercourse. Both counts of the indictment allege the necessary elements for criminal sexual assault, and the State proved two separate acts in violation of section 12—13 of the Code. Defendant's double jeopardy rights are not implicated.

The final issue raised by defendant is whether the trial court abused its discretion in sentencing defendant to two 7-year terms of imprisonment. Defendant contends the trial court abused its discretion in three ways: (1) by implying that it would have been more lenient had defendant abandoned his claim of innocence; (2) referring to the fact that he left "four victims" as a result of his actions; and (3) by imposing a sentence greater than the minimum. All three arguments raised by defendant are without merit.

The imposition of a sentence is a matter of judicial discretion and, absent an abuse of that discretion, the sentence imposed by the trial court will not be altered on review. A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

■ At the sentencing hearing, defendant made the following statement on his own behalf:

"I would like to say due to the seriousness of the charges, it's forced me to look at myself, and I regret getting in the situation that I got in, which all I want to do is just get through this and return back to my family."

Thereafter, when pronouncing the sentences, the trial court stated:

"I have heard some expression of remorse this morning, although frankly I believe he was somewhat ambivalent. When the Defendant says he was sorry, he's sorry that he allowed himself to be in a position where this could happen, that sounds almost as if he is simply sorry that he got in the car with the young lady as opposed to being sorry for committing the offenses that a jury has concluded beyond a reasonable doubt that he committed."

Defendant alleged the court, as evidenced by the above statement, sentenced him more severely because of its belief he was not sorry for his crime.

A more severe sentence may not be imposed because a defendant refused to abandon his claim of innocence. (*People v. Byrd* (1986), 139 Ill. App. 3d 859, 487 N.E.2d 1275.) In *People v. Leckrone* (1985), 134 Ill. App. 3d 978, 983, 481 N.E.2d 343, 347, this court stated the following:

"[I]t is no more acceptable for a court to punish a defendant's lack of remorse than to punish his insistence on innocence. * * *

* * * [A]ccordingly, we hold that a defendant's lack of remorse * * * can only be the basis of a reversal if it is manifestly clear from the record that the final determination of sentences reflects the consideration by the court of these factors."

The supreme court, however, in *People v. Ward* (1986), 113 Ill. 2d 516, 499 N.E.2d 422, declined to follow *Leckrone* and stated a trial judge must consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and every aspect of his life relevant to the sentencing proceeding. The court further stated that in some instances and under certain factual circumstances, a continued protestation of innocence and the lack of remorse may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society. Such impressions garnered by the trial judge from the entire proceeding are proper factors to consider in imposing sentence. *Ward*, 113 Ill. 2d at 528, 499 N.E.2d at 426.

Such a situation is present here, albeit perhaps to a lesser degree. Defendant's statement indicated he was not sorry for what he had done to the victim, but rather he was sorry for what he had done to himself by allowing himself to be in that position. The trial court was correct in taking into account the quality and extent of defendant's remorse given the facts and circumstances of the case.

■ Defendant next contends the trial court erred when it stated the following with respect to having sympathy for defendant's family: "[defendant] has left not only one victim, he has left at least four." Defendant asserts, without any authority, that it is error for the trial court to consider any other victim(s) other than the complainant herein.

In some instances, references to a victim's family or defendant's family may be improper and constitute impermissible error. The comment by the trial court here was merely a passing reference to defendant's family. The court was well aware of the fact that defendant left a wife and two children. Nothing in the record suggests this factor had any bearing on the sentence imposed. In light of the other factors properly considered by the trial court in sentencing defendant, this remark by the trial court had no effect on the sentence imposed. See *Ward*, 113 Ill. 2d at 526-27, 499 N.E.2d at 425-26.

■ Finally, defendant contends the trial court abused its discretion by imposing sentences greater than the minimum. Defendant cites numerous other cases where a defendant was convicted of a more serious criminal sexual act and yet received a lesser sentence.

Where a sentence falls within the statutory range and the court has not erred in the factors considered, a reviewing court will not alter the sentence unless it constitutes an abuse of discretion by the trial court. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

The statutory range of terms of imprisonment for criminal sexual assault, a Class 1 felony, is not less than 4 and not more than 15 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4).) Obviously, seven-year terms of imprisonment fall within this range. The trial court also considered defendant's presentence report, which established he had a prior burglary conviction as a juvenile, a battery conviction as an adult, and various traffic convictions. The court also considered the letters submitted by defendant's family and friends but concluded that they did not fully describe him. The trial court noted defendant had a previous drug and alcohol problem that he had declined to fully address. Finally, the court noted the prolonged and brutal nature of the assault upon the victim and this factor, coupled with the aforementioned factors, led the trial court to conclude that a sen-

tence greater than the minimum was appropriate. Viewing the record as a whole, there was no abuse of discretion by the trial court in the sentences imposed.

For the foregoing reasons, defendant's conviction and sentence are affirmed.

Affirmed.

LUND, P.J., and STEIGMANN, J., concur.